**John S. HOLCROFT, Jr., Respondent,**

v.

**MISSOURI–KANSAS–TEXAS RAILROAD COMPANY, Appellant.**

**No. KCD 30423.**

Missouri Court of Appeals, Western District.

March 3, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 7, 1980.

Application to Transfer Denied May 1, 1980.

Daniel M. Dibble, Kansas City, for appellant.

Clyde G. Meise, Mark A. Thornhill, Meise, Cope & Coen, Kansas City, for respondent.

Before WASSERSTROM, C. J., Presiding, and WELBORN and MURPHY, Special Judges.

J. DONALD MURPHY, Special Judge.

Plaintiff obtained a verdict for $1.00 *nominal* damages and $75,000 punitive damages against the defendant railroad for failure to comply with the service letter statute, Section 290.140, RSMo 1978. Defendant on this appeal contends that the trial court erred in submitting the issue of punitive damages to the jury without either a submission and finding of *actual* malice *or* proof of substantial *actual* damages or other injury. Defendant contends alternatively that the punitive damage award is grossly excessive.

Plaintiff was employed on March 13, 1964, by defendant railroad as a special agent at a salary of $405.00 per month. His previous employments included jobs as an insurance investigator and deputy sheriff. His duties with the railroad were essentially those of a railroad detective—to investigate and attempt to prevent thefts of railroad property and property being shipped by rail. In this connection, he worked with the Federal Bureau of Investigation and, in particular, an agent named Alan Rotton who became his personal friend. Plaintiff was stationed at the Kansas City terminal.

From the date of plaintiff's employment in March 1964, until the year 1974, plaintiff performed his duties as a special agent to the reasonable satisfaction of his employer. He received several increases in pay and at the date of his termination in 1975 his salary was $880.00 per month. In April 1973, following the successful completion of an investigation of thefts from rail cars near Eve, Missouri, he received a letter of commendation from the vice-president in charge of administration of the railroad for his "excellent work." There was no evidence that at any time during his eleven years with the railroad his personnel file contained any derogatory information.

In October 1971, Mr. Gene Bolin was hired by the railroad to serve as a special agent for eastern Missouri. He was interviewed and recommended for the position by plaintiff. In May 1973 Bolin was promoted to the job of chief special agent and became plaintiff's immediate supervisor. His office was in Denison, Texas. Bolin testified that plaintiff had wanted the job as chief special agent and had expected to be appointed. Plaintiff, however, testified that he had not been interested in the promotion because it required his transfer to Denison and entailed a salary increase of only $45 per month.

In 1974, plaintiff, working with FBI agent Rotton, commenced an investigation of grain thefts from the railroad yards in Kansas City, Kansas. Mr. William Ziedel, a vice-president of the railroad with administrative supervision over the special agents,

approved the investigation and told plaintiff to keep him "directly informed." Ziedel's office was in Dallas, Texas. Plaintiff testified that he was instructed by Ziedel not to make reports to Bolin but to submit a written report to Ziedel after the investigation was completed. Ziedel, however, testified that he did not tell plaintiff to bypass Bolin and had assumed that he and Bolin would both receive interim reports, oral and written, as the investigation continued. Ziedel testified that he was "in fairly constant communication" with plaintiff about the progress of the investigation but did not receive any written reports. Bolin, too, received telephone reports from plaintiff at his office in Denison. Plaintiff testified that Ziedel seemed "well pleased" with the progress and results of the investigation.

It is clear from the testimony of both plaintiff and Bolin that beginning in 1974 the personal and business relations between plaintiff and Bolin became strained.

In the summer of 1974, during the course of the grain investigation, it became known to agent Rotton that two employees of defendant named Doyle, a terminal superintendent, and DeVeney, a chief clerk, had, a year or so previously, falsified some railroad payroll records. The railroad had handled the matter administratively and, after a formal hearing, had discharged the offenders and subsequently rehired them without restoration of back pay (the railroad suffered no pecuniary loss as a result of the falsifications). Rotton decided to seek prosecution of Doyle and DeVeney in the federal court and asked plaintiff to help him in the investigation. Plaintiff agreed and advised his superiors of the proposed investigation. They—Ziedel and Bolin—did not express any objection.

Early in the investigation it occurred to plaintiff that his participation in the ongoing investigation of Doyle and DeVeney might create trouble for him with his employer because Doyle and DeVeney were in "top positions" and might cause "repercussions." He decided to seek letters of recommendation from railroad officials to protect

himself in the event his job was put in jeopardy. He therefore in July 1974 requested and obtained recommendations from several officials of the railroad, including Ziedel and Bolin. Plaintiff told them he wanted the letters because he was seeking other employment—which was not true. All of the letters so obtained referred to plaintiff's association with the railroad in favorable terms and none contained any statement of dissatisfaction with any aspect of his performance. Bolin's letter, although more restrained than the others, stated that plaintiff "[d]uring his ten years of service . . . has carried out all assignments called upon to perform" and "[h]e would go to an assignment and the railroad could depend upon him to do the job properly and without problems." At the trial Ziedel and Bolin testified that their letters of recommendation were based upon plaintiff's past service as a special agent, which had been satisfactory, and not upon his performance at the time, which Bolin, at least, considered to be unsatisfactory.

In the fall of 1974 plaintiff and Rotton went to Dallas for a meeting with Ziedel and Mr. R. M. Whitman, president of the railroad. Plaintiff and Rotton testified that Ziedel had arranged the meeting to discuss the grain theft and the Doyle-DeVeney investigations. Ziedel contended that the meeting was requested by plaintiff. At the meeting Whitman expressed concern about Doyle and DeVeney (who by that time had been rehired) and referred to them as "very fine people." In response Rotton told Whitman that they "still were going to be prosecuted."

Thereafter Rotton signed a complaint against Doyle and DeVeney in the federal district court in Kansas City, Kansas, alleging falsification of payroll records. Plaintiff was listed as a witness. On the day following, Bolin telephoned plaintiff from Denison, Texas, and instructed him to contact the FBI and the district attorney's office and attempt to secure dismissal of the charges. He told plaintiff that prosecution would be detrimental to the efforts of the railroad to successfully complete pending applications for loans with the federal government. Plaintiff testified that Bolin threatened him with loss of his job if he failed to cooperate. He testified that Ziedel in the same telephone conversation likewise urged him to attempt to get the charges dismissed, saying that the prosecution "would in no way benefit the railroad." Ziedel denied participating in the conversation. Bolin admitted that the conversation took place between him and plaintiff, but denied that he threatened to discharge plaintiff. Plaintiff testified that he made no attempt to get the charges dismissed because he considered such an effort to be an obstruction of justice. Rotton, when told of the telephone call, advised plaintiff to make a written record of the incident for submission to the United States attorney as a possible violation of the federal statute on obstruction of justice.

On April 28, 1975, Doyle and DeVeney pleaded guilty in the United States district court to misdemeanor charges and received suspended sentences. On the same day and after the pleas of guilty were entered Bolin handed plaintiff a letter of termination signed by Bolin which stated in part:

"Your employment as a Special Agent, from the time I have been in charge of this department, has been inadequate and completely unsatisfactory, in that you have failed to perform the duties requested of you and you have neglected to keep me informed on matters that have occurred in the Terminal at Kansas city, that I should have been made aware of."

Bolin testified that he had decided in early 1974 to terminate plaintiff, but on the advice of Ziedel had deferred firing him because of plaintiff's involvement in the grain theft and the Doyle-DeVeney investigations. Ziedel testified that he had concurred in the decision to terminate plaintiff.

In July 1975 plaintiff requested a service letter from the defendant railroad. The reply from the personnel manager merely stated that Bolin's letter of April 28 gave the reason for plaintiff's discharge.

Plaintiff was unemployed for eleven months following his termination. He

eventually obtained a job as a deputy sheriff at a salary of $500 per month. At the trial he offered no evidence to prove that the service letter contributed to his unemployment or to his loss of income. Prior to trial counsel stipulated as follows:

"MR. DIBBLE: . . . As I understand it, counsel for plaintiff is not contending and does not intend to prove any actual damages, even if there is shown to be a violation of the service letter statute, other than the one dollar nominal, is that correct?

"MR. MEISE: That is correct.

"MR. DIBBLE: And whatever expenses the plaintiff may have claimed to incur in job hunting, selling his house, or other out-of-pocket money, is not claimed as an item of actual damage in this case.

. . . . .

"MR. MEISE: That's correct."

The court instructed the jury that if it found the issues in favor of plaintiff it was to return $1.00 actual damage. The court further instructed the jury that if it found *legal* malice it might return an additional amount as punitive damages.[1] The court did not instruct on *actual* malice.

There is substantial evidence in the record to support the finding of the jury that the service letter—Bolin's letter of April 28, 1975—did not state the true reason for plaintiff's discharge and that defendant was motivated by at least legal malice in writing the letter. Defendant on this appeal concedes as much. The jury, in effect, found that plaintiff was discharged not for the reasons stated in the letter but because he refused to comply with instructions to

get the Doyle-DeVeney prosecutions dismissed.

Defendant vigorously contends that the giving of Instruction No. 5 was erroneous because it permitted an award of punitive damages on a finding of *legal* malice and without proof of substantial actual damages or other injury.[2] Defendant argues that no award of punitive damages has ever been sustained in a service letter case when accompanied by only nominal actual damages unless there was either a finding of *actual* malice or a showing of substantial actual damages or other injury to the plaintiff. Defendant concedes that no Missouri case has expressly formulated such a rule but contends that an analysis of all the appellate opinions shows a consistent factual determination of either substantial actual damages (or injury) or actual malice as predicates to an award of punitive damages.

We have carefully read the cases cited by defendant and conclude they do not support defendant's theory. It is settled law that a finding of legal malice—as distinguished from actual malice—will support an award of punitive damages in service letter cases. Legal malice exists where a wrongful act is intentionally done without just cause or excuse; actual malice exists *"when one with a sedate, deliberate mind and formed design injures another, as where the person is actuated by spite and ill will in what he does and says, with a design willfully or wantonly to injure another."* *Heuer v. John R. Thompson Co.*, 251 S.W.2d 980 (Mo.App.1952). See also *Davenport v. Midland Bldg. Co.*, 245 S.W.2d 460 (Mo.App. 1951); *Schmidt v. Central Hardware Com-*

---

1. "Instruction No. 5. . . . and if you believe the conduct of defendant . . . was willful, wanton, or malicious, then . . . you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish defendant and to deter it and others from like conduct.

"The term 'malicious' as used in this instruction does not mean hatred, spite or ill will, as commonly understood, but means the doing of a wrongful act intentionally without just cause or excuse."

2. Defendant in its brief uses the terms "injury," "other injury," "substantial injury," "actual injury," "legal injury," "non-monetary injury," and "significant injury" in referring to any injury or loss not included in the term "substantial actual damages." Presumably the terms refer to injury or loss shown by the evidence but not measurable as an item of compensable damage and not submitted to the jury as such. We shall use the word "injury" in that context throughout this opinion.

*pany*, 516 S.W.2d 556 (Mo.App.1975).[3] It is equally well settled law that in service letter cases a recovery of only nominal actual damages will support a punitive damages award. And it has been stated that a showing of legal malice when *combined* with a recovery of only nominal damages will support a punitive award. *Schmidt v. Central Hardware Company, supra; Bubke v. Allied Building Credits, Inc.*, 380 S.W.2d 516 (Mo. App.1964). As stated in *Schmidt*:

> "Nominal damages are recoverable upon a *mere showing* of *liability, along with punitive damages*, where there is evidence of either actual or legal malice."[4] (emphasis added).

Defendant would have us modify the rule stated in *Schmidt* as it applies to punitive damages by requiring some showing of substantial damage or injury to the plaintiff. This we decline to do. The fact that service letter cases almost invariably involve some element of damage or injury—as the cases cited by defendant indicate—and that no judgment for punitive damages has been affirmed without such a showing (absent actual malice) does not mandate a change in the rule. The relation of punitive damages to the nominal or compensatory award is very tenuous. Punitive damages are mere incidents to the cause of action and are considered separate and apart from and in addition to the assessment of actual damages. *Woods v. Standard Personal Loan Plan, Inc.*, 420 S.W.2d 380 (Mo.App.1967); *State ex rel. St. Joseph Belt Ry. Co. v. Shain*, 341 Mo. 733, 108 S.W.2d 351 (1937), and cases cited. There is, on the other hand, a very direct relation between the amount of punitive damages awarded and the degree of malice proved. The very purpose of an award of punitive damages is to punish the defendant for the doing of a malicious act, and to set an example that will deter similar conduct in the future. Punitive damages are very largely proportioned to the degree of malice. Formulation of a rule, as proposed by defendant, would tend to complicate and distort the present rule by an undue emphasis on injury at the expense of malice.

Defendant alternatively contends that the verdict for punitive damages is grossly excessive and requires a remittitur. We are not inclined to agree. The verdict is certainly liberal, and exceeds the award in any service letter case called to our attention. That fact does not in and of itself require a remittitur. *Potter v. Milbank Manufacturing Company*, 489 S.W.2d 197 (Mo.1973). Nor does the fact that the actual damage award was a nominal $1.00 bear any relation to the amount of the punitive damages. It has been held, however, that there is some general relation between the *injury inflicted* and the punitive damages. *State ex rel. St. Joseph Belt Ry. Co. v. Shain, supra.* In *Shain* the court quoted the following with approval.

> " '[T]he general doctrine is that the punitive damages awarded must bear some relation to the *injury inflicted* and the cause thereof, though they need not bear any relation to the damages *allowed* by way of compensation.' 33 A.L.R., p. 398, note . . . 8 R.C.L. § 137, p. 593, states: . . . [I]f actual damage is shown, even though its amount is not shown, or found, . . . exemplary damages may be awarded; in other words, after actual damage is shown, it is unnecessary to show its money extent to sustain a judgment for exemplary damages." (emphasis by the court).

The award of punitive damages is peculiarly a function of the jury and absent an abuse of discretion an appellate court is not justified in interfering with the assessment. *Beggs v. Universal C. I. T. Credit Corporation*, 409 S.W.2d 719 (Mo.1966); *Price v. Ford Motor Credit Company*, 530 S.W.2d 249 (Mo.App.1975); *Coonis v. Rog-*

---

3. Arguably, in the instant case, plaintiff's evidence, if believed, tended to show actual malice. Plaintiff, however, elected to submit only the issue of legal malice.

4. As defendant points out, the appellate court in *Schmidt* found that plaintiff suffered injury—loss of employment—but lacked proof of the amount of her damages. That finding, in our opinion, does not alter the rule expressed.

*ers,* 429 S.W.2d 709 (Mo.1968); *Seested v. Post Printing & Publishing Co.,* 326 Mo. 559, 31 S.W.2d 1045 (1930). In *Potter, supra,* the court said:

"Of course the trial court had the discretion to reduce the judgment, and this court is authorized to review the trial court's ruling to determine whether such was an abuse of discretion. An award of punitive damages need not be reduced solely because no other award has reached the same figure; something else should be demonstrated as a basis for finding an abuse of discretion in failure to require remittitur, because the matter of punitive damages 'is so purely and peculiarly one for the jury's discretion that regardless of what the character of the action may be　\*　\*　\*, it is only in an extreme case that an appellate court will undertake to revise such an award.' *La Chance v. National Pigments & Chemical Co.,* Mo.App., 104 S.W.2d 693, 701[19]."

"Abuse of discretion" in the reference here used, has been defined as meaning "so out of all proper proportion to the factors involved as to reveal improper motives or a clear absence of the honest exercise of judgment." *Beggs v. Universal C. I. T. Credit Corporation, supra.*

The trial court, as part of its order overruling defendant's motion for new trial, stated that the court had carefully considered defendant's allegations of error and concluded that "the amount of the verdict for punitive damages was a matter peculiarly within the province of the jury's discretion" and "under the facts and circumstances of the case said award was not excessive; . . ." Deference is due to this considered action of the trial court in denying remittitur. *Price v. Ford Motor Credit Company, supra* ; *Ricketts v. Kansas City Stock Yards of Maine,* 537 S.W.2d 613 (Mo.App.1976).

We find nothing in the record tending to show any abuse of discretion by the trial court in so finding. The basic issue in this litigation—whether or not the service letter stated the true reason for plaintiff's discharge—was sharply contested and found against the defendant. The other issue—whether or not defendant's conduct in that regard was malicious—was likewise found against the defendant. These findings obviously reflect the jury's belief that the railroad fired plaintiff because he refused to comply with the defendant's request to seek dismissal of the Doyle-DeVeney prosecutions—an action which plaintiff considered to be an obstruction of justice. It was the duty of the jury to assess a penalty sufficient to punish defendant and to deter others in similar circumstances from similar conduct. In doing so the jury could properly consider such elements as the degree of malice or positive wrongdoing exhibited by the defendant, the injury inflicted upon plaintiff, the financial worth of plaintiff and defendant, and the character of the parties. *Beggs v. Universal C. I. T. Credit Corporation, supra* ; *Beck v. Dowell,* 111 Mo. 506, 20 S.W. 209 (1892); *Peak v. W. T. Grant Company,* 386 S.W.2d 685 (Mo.App. 1965). The diversity and number of these factors preclude the application of any formula to judge the propriety of a punitive award. Rather, each case must be considered in light of its particular factual setting. *Peak v. W. T. Grant company, supra.* The financial worth of the defendant was not shown, but the jury was made aware that the defendant was a major railroad operating in at least three states with extensive trackage and several branch offices. The jury could reasonably conclude that a smaller award of punitive damages would have little deterrent effect. There was evidence that the plaintiff was without work for eleven months subsequent to his termination by the railroad and that his salary at his next employment was $380 per month less than his salary with the railroad. This evidence—received without objection or limitation—was admissible as tending to show the financial circumstances of plaintiff. *Beck v. Dowell, supra.* It was doubtless considered by the court and jury as

tending to show injury to the plaintiff.[5] The jury obviously and properly placed the greatest emphasis on the factor of malice or positive wrongdoing exhibited by the defendant, acting through its agent Bolin, in giving false reasons for plaintiff's discharge.

We are unable to say that there was any abuse of the discretion exercised by the jury and the trial court so far as the assessment of punitive damages is concerned.

Judgment affirmed.

All concur.

---

5. The stipulation by plaintiff's counsel that plaintiff was "not contending and does not intend to prove any actual damages" appears to be a somewhat ambiguous statement that as a matter of trial tactics he did not intend to submit to the jury any claim for actual damages in excess of one dollar.