Phillip A. BOYER, Appellant,

v.

GRANDVIEW MANOR CARE CENTER,
INC., and Vada Mae Eder,
Respondents.

No. WD 39427.

Missouri Court of Appeals,
Western District.

Aug. 2, 1988.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 14, 1988.

Application to Transfer Denied
Nov. 15, 1988.

Brian Timothy Meyers, Kansas City, for appellant.

George Barton, Kansas City, for respondents.

Before BERREY, P.J., and MANFORD and COVINGTON, JJ.

BERREY, Presiding Judge.

The issue presented on appeal is whether the trial court properly granted a new trial upon respondents' motion, vacating judgment in favor of appellant, Phillip A. Boyer, M.D., upon his claim for damages against respondents, Grandview Manor Care Center, Inc., and Vada Mae Eder, for tortious interference with the physician/patient relationship between appellant and residents of Grandview Manor. Specifically, appellant asserts that the trial court erred in granting a new trial on the grounds specified in the new trial order which were: (1) that the verdict was so excessive as to indicate that it was rendered because of bias, passion, prejudice; (2) that the amount of punitive damages awarded by the jury bore no reasonable relationship to either the injury or to the evidence on which the award of punitive damages could be based; and (3) that the court had erred in overruling defendants' objection to plaintiff's closing argument because plaintiff's counsel improperly argued issues and facts abandoned by plaintiff which were not relevant to the sole incident submitted to the jury.

Dr. Boyer was hired as the house physician for Grandview Manor when it first opened in 1979. Grandview Manor is an intermediate care facility with 102 beds available for permanent residents. A house physician is a physician who is usual-

ly referred patients whose own doctors are not going to follow them when they enter a nursing home. Dr. Boyer would visit his nursing home patients at least once a month, receiving $20 per patient per visit. His bills were sent to the responsible party for the patient. A responsible party is usually a friend, family member or guardian who looks out for the interests of a resident of the nursing home, making major decisions for them, such as the decision to retain or terminate the services of a resident's physician.

In November, 1982, Dr. Boyer began to have some of his patients terminate their relationship with him. In fact, from November, 1982, to August, 1983, twenty-five patients terminated Dr. Boyer as their treating physician. In April, 1983, after he had been terminated by eleven patients he wrote a letter to Vada Mae Eder expressing his concern over the "mysterious" defection of these patients and tendering his resignation. He emphasized that he intended to continue as the physician for his remaining patients until such time as he was notified that they wished to discharge him. After he had sent this letter he began to receive notes from his patients or their responsible parties indicating that he was being discharged.

Dr. Boyer filed suit against Vada Mae Eder and Grandview Manor Care Center, Inc., alleging tortious interference with his physician/patient contractual relationships with twenty-six patients. His claim was based upon the actions of Eder, who had contacted the responsible parties for Dr. Boyer's patients and informed them of his retirement. Eder testified that she had nothing to do with the change of physicians in regard to the first ten or twelve patients. She also testified that she stopped referring patients to Dr. Boyer and started referring them to three new physicians who had offices in the Grandview area and who referred clients to the nursing home. She stated that one of the disadvantages of Dr. Boyer was that he had no office and thus, no client basis to refer patients to her. Another disadvantage was the retirement of Dr. Boyer.

Eder testified that she began contacting the responsible parties for the patients of Dr. Boyer after she received the letter and told them that, "Doctor had resigned as the house physician, he was planning on retiring, we had three new doctors that had offices in town, they were accepting patients, what would they like to do." Her testimony differed markedly from an earlier affidavit in which she indicated that she had been receiving complaints about Dr. Boyer and beginning in November, 1982, she contacted each of the responsible parties for the residents under Dr. Boyer's care and explained that Dr. Boyer would no longer be serving as house physician at Grandview Manor and giving them a choice of continuing with Dr. Boyer or changing to a new physician. Hal Juckette, the president of Grandview Manor, testified that he gave Eder no specific instructions but told her to do whatever she felt needed to be done.

Although Dr. Boyer alleged tortious interference with twenty-six contracts the case was submitted to the jury on one physician/patient relationship, that between Dr. Boyer and Elizabeth Clegg. Betty Hug, the daughter of and responsible party for Clegg, testified in a deposition which was read to the jury:

Q. Did you terminate Dr. Boyer as your mother's physician sometime in 1983?

A. Yes. It was my decision to do it. My husband and I, we make all these decisions because of an incident that occurred.

Q. What was that incident?

A. My mother was ill with a cold or the flu or a respiratory problem of some sort. The nursing home called and said she needed some medication. I don't know whether they specified an antibiotic or what they did. This, you know,—time kind of takes away the edge of things.

Q. Sure.

A. They wanted to know if they could contact the doctor to give it to her, and I said of course, whatever she needs. They called me back and

said Dr. Boyer, which was her doctor at that time, refused to give it to her, and I said let's get another doctor, which we did.

Q. Who was the person you were talking to on the phone, do you recall?

A. I don't remember. I don't remember.

Q. You don't remember?

A. Nursing home, I don't know whether it was a nurse or whether it was the administrator; I do not remember.

One of the nurses working at Grandview Manor at that time, Rebecca Estes, was called upon to testify. She stated that Clegg had developed some upper respiratory problems and was not responding to the medication prescribed for her condition by Dr. Boyer. When Estes told Eder that she was going to notify Dr. Boyer of the change in the patient's status, she was told that this would not be necessary and to "get the family on the phone and we'll change physicians." Estes called the family, put the phone on hold, and Eder told them that Dr. Boyer refused to order the antibiotics necessary to treat Clegg.

The jury returned a verdict in favor of Dr. Boyer, finding that as a result of the tortious interference with his physician/patient relationship with Clegg, he had been damaged in the amount of $340 actual damages. He was also awarded $30,000 in punitive damages against Eder and $300,000 in punitive damages against Grandview Manor. The defendants filed a timely motion for judgment notwithstanding the verdict or, in the alternative, motion for a new trial. After hearing these motions, the trial judge granted the defendants' motion for a new trial. This appeal followed.

In reviewing the order for a new trial, "we look at all reasonable inferences favorable to the trial court's ruling unless there has been a clear abuse of discretion in granting the motion." *Harris v. Washington*, 654 S.W.2d 303, 306 (Mo.App.1983). If any one of the three reasons given by the trial court in support of its action granting a new trial is proper then its ruling will be affirmed. *State ex rel. State Highway Commission v. Klipsch*, 414 S.W.2d 783

(Mo.1967). The trial judge gave three reasons for sustaining the motion for new trial, citing paragraphs 2.c., e. and g. in the defendants' motion which stated:

c. The verdict was so excessive as to indicate it was the result of bias, passion and prejudice. While the Missouri Supreme Court has abolished remittitur, the Court can and should order a new trial.

e. The amount of punitive damages awarded bears no reasonable relationship to the injury alleged, and bears no reasonable relationship to the evidence on which an award of punitive damages could be based.

g. The court erred in overruling defendants' objection to plaintiff's closing argument, in that plaintiff's counsel improperly argued issues and facts abandoned by plaintiff and not relevant to the sole incident submitted to the jury in the Court's instructions, the alleged tortious interference with the alleged physician/patient relationship between plaintiff and Elizabeth Clegg. Argument regarding alleged interference in other relationships not submitted to the jury was irrelevant, improper, and prejudicial, resulting in a verdict based on bias, passion, and prejudice.

■ There are two different types of objections which may be made against the amount of a jury verdict. *Veach v. Chicago and North Western Transportation Company*, 719 S.W.2d 767 (Mo. banc 1986). One is that the verdict was against the weight of the evidence. Rule 78.02. If this is the reason given by the trial court for allowing a new trial in a cause then appellate courts will not interfere. *Veach v. Chicago and North Western Transportation Company, supra*, 719 S.W.2d at 769. This was not the ground chosen by the trial court in formulating reasons upon which to grant a new trial. Instead, the trial court based its order for a new trial on the second type of objection, that the verdict was so excessive as to indicate that it was rendered as a result of bias, passion, and prejudice. Here appellate courts may reverse if, in holding so, the trial court was arbitrary. *Id.* In the instant case there is

no doubt that the trial court acted arbitrarily.

It is true that a trial court may find passion and prejudice on the part of a jury by the excessiveness of the verdict standing alone. *White v. St. Louis–San Francisco Railway Company*, 602 S.W.2d 748, 754 (Mo.App.1980). Only one claim of tortious interference was submitted to the jury, that complained of in the relationship between Dr. Boyer and patient Clegg. The twenty-five other claims were abandoned by counsel after an exchange in chambers with the trial judge. The bias, passion and prejudice mentioned by the trial judge in his reasons for granting a new trial stem from the amount the jury awarded on this claim which was over and above the amount prayed for by Dr. Boyer.

During the closing argument Dr. Boyer's counsel made reference to evidence relating to the other twenty-five patients over the timely and continuing objection of the defendants. These objections were overruled by the trial judge. Apparently, after the verdict, the judge changed his mind about the correctness of his action in overruling defense counsel's objections. This is reflected in the reasons given for ordering a new trial.

When reviewing the grant of a motion for a new trial after a verdict in favor of the plaintiff, plaintiff is entitled to have the evidence and all reasonable inferences deducible therefrom, viewed in the light most favorable to him. *Luyties Pharmacal Co. v. Fredric Co., Inc.*, 716 S.W.2d 831, 833 (Mo.App.1986). We therefore turn to the closing argument made by counsel. The elements necessary to a cause of action for the tort of intentional interference with a contract are fivefold: " "(1) A contract or a valid business relationship or expectancy (not necessarily a contract); (2) Defendant's knowledge of the contract or relationship; (3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) The absence of justification; and (5) Damages resulting from defendant's conduct.' " *C & M Developers, Inc. v. Berbiglia, Inc.*, 585 S.W.2d 176, 183 (Mo.App.1979) (quoting *Salomon v. Crown Life Ins. Co.*, 536 F.2d 1233, 1238 (8th Cir. 1976)). The closing argument made reference to the other twenty-five patients and Eder's actions in dealing with them. No claim for damages was made for these twenty-five claims nor, in fact, did the jury award actual damages beyond the instructions. The evidence presented goes to the question of intent. It also reflects on credibility.

Counsel is permitted wide latitude in argument although he may not go beyond the issues and urge a theory or claim or defense outside of the scope of the court's instructions. *Penn v. Hartman*, 525 S.W.2d 773, 776 (Mo.App.1975). It is well established that "[e]vidence of other acts of defendant are admissible if those acts are sufficiently connected with the wrongful acts that they may tend to show defendant's disposition, intention, or motive in the commission of the acts for which exemplary damages are claimed." *Baker v. Newcomb*, 621 S.W.2d 535, 538 (Mo.App.1981). As all of the issues presented by counsel were well within the scope of the closing argument, it was not error for the trial judge to overrule defendants' objections. The evidence of Eder's actions in calling the responsible parties of patients with news of Dr. Boyer's retirement, as well as the conflicts between her testimony at trial and her affidavit as to when these calls were made goes directly to issues of intent, justification and credibility and was proper for the jury to consider in assessing punitive damages.

Punitive damages are, of course, the crux of the problem in the instant case. The trial judge obviously labored under a misapprehension as to the nature and purpose of a punitive damage award vis-a-vis a claim of tortious interference. Punitive damages are awarded for the purpose of punishing a wrongdoer who commits a malicious act and also for deterring similar conduct in the future. *Snodgrass v. Headco Industries, Inc.*, 640 S.W.2d 147, 156 (Mo.App.1982). Respondent tries to tie the award of punitive damages to the award of actual damages, invoking some type of

magic number in order to gauge excessiveness. This argument is meaningless. There is no fixed relationship or magic formula between the amount of punitive damages awarded and the amount of actual damages awarded. *Labrier v. Anheuser Ford, Inc.*, 621 S.W.2d 51, 58 (Mo. banc 1981). The proper relationship to examine is that between the degree of malice proved and the punitive damage award. *Holcroft v. Missouri–Kansas–Texas Railroad Company*, 607 S.W.2d 158, 163 (Mo.App.1980). Here, Dr. Boyer's actual damages were minimal. It can not be said, however, that the punitive damage award was unreasonable in view of the actions of Eder in contacting Hug and leading her to believe that necessary medicine was being withheld from her mother. This action goes straight to the heart of a physician's responsibility in alleviating the suffering of his patients and the malice behind the action could be found by a jury to be sufficient to warrant the award given in the instant case.

The ultimate question before this court is whether the trial judge abused his discretion in ordering a new trial. An abuse of discretion has been defined as, "a judicial act which is untenable and clearly against reason and which works an injustice." *State v. Stubenrouch*, 499 S.W.2d 824, 826 (Mo.App.1973). The judge's action in this case fits within this definition. The judge, in a conference prior to the closing argument made several statements which revealed his lack of understanding as to punitive damages. He stated:

> With reference to those other patients of his that are now no longer in the suit, of course the reason why punitive damages couldn't properly be submitted on that proposition is the record really was absent as to the cause of the severance of a physician-patient relationship in a manner that would justify the imposition of punitive damages.
>
> I realize plaintiff has an argument, there's a strong inference in plaintiff's opinion as to the effect that either's conduct did this, but there wasn't any proof sufficient, in my opinion, to draw the ultimate conclusion, and then the second conclusion, that the conduct would entitle

the submission of punitive damages to him of those other patients.

It is well settled by Missouri law that, "a submissible punitive damage question is made for the jury once the plaintiff has presented sufficient evidence of legal malice—the intentional doing of a wrongful act without just cause or excuse." *Ross v. Holton*, 640 S.W.2d 166, 174 (Mo.App.1982). *See also Honigmann v. Hunter Group, Inc.*, 733 S.W.2d 799, 809 (Mo.App.1987). In other words, if a submissible case has been made on a tortious interference claim, then the elements for a punitive damage submission are also present. The record reveals that the judge wasn't clear on this point.

> THE COURT: Well, you're treading on awful thin ice on that proposition, because there was no real explanation for the termination of him of those relationships, with the exception of plaintiff's surmise, really, that that must have come out because of this. That's why I say if you wanted to go on 24 to 25 other patient-physician relationships, there's just a woeful lack of competent evidence, in my opinion, of the defendants' conduct that would justify a punitive damage instruction.

The issue of punitives is "purely and peculiarly" one for the jury once the trial court has decided that the matter should go before the jury and is not to be reversed absent a clear showing of an abuse of discretion. *Mullen v. Dayringer*, 705 S.W.2d 531, 536 (Mo.App.1985). The grant of a new trial reflects the trial court's own confusion as to the propriety of punitive damages and the allowable evidence in the closing argument. This is an abuse of discretion on the part of the trial court and, as such, we reverse the order granting a new trial and remand with directions to reinstate the verdict as amended to conform with the pleadings.

MANFORD, J., dubitante.

COVINGTON, J., concurs.