Charles L. WOLF, Plaintiff–Respondent,

v.

The GOODYEAR TIRE & RUBBER COMPANY, Defendant–Appellant.

No. WD 42980.

Missouri Court of Appeals,
Western District.

March 19, 1991.

As Modified April 25, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 30, 1991.

Application to Transfer Denied
June 11, 1991.

Kirk T. May, William D. Beil, Stinson, Mag & Fizzell, Kansas City, for defendant-appellant.

Randy W. James, John C. Risjord & Associates, Overland Park, for plaintiff-respondent.

Before GAITAN, P.J., and TURNAGE and KENNEDY, JJ.

TURNAGE, Judge.

Charles L. Wolf brought suit against The Goodyear Tire & Rubber Company[1] for injuries sustained when a multi-piece rim came apart and parts of it struck Wolf. The jury awarded Wolf $90,000 in actual damages but assessed 45% fault against him. The jury assessed $250,000 in punitive damages against Goodyear. Goodyear contends the court erred in denying its motion for directed verdict or for judgment notwithstanding the verdict because there was insufficient evidence to establish that the injuries resulted from a reasonably anticipated use; that there was insufficient evidence to support the punitive damages award; that the imposition of punitive damages denied Goodyear due process and equal protection of the laws and the punitive damages award should be reduced by the portion of Wolf's fault. Affirmed.

There is little dispute concerning the facts. Wolf was an employee of Thomas

---

1. Also named as defendants were Volvo White Truck Corp. and Midway U.S.A., Inc. In addition to Wolf's suit for personal injuries his wife filed suit for loss of consortium. The jury found in favor of Volvo and Midway and found against the wife's claim. No appeal has been taken concerning any of these claims.

Disposal Company in Liberty in June of 1987. Wolf drove a truck for Thomas and a few days before the injury his truck had a flat tire. Thomas told Wolf to repair the tire when he had time because the employee who normally changed tires was off. A few days later Wolf looked at the flat tire in the shop and said there was nothing about the appearance of the tire or rim that made him think he could not remove the tire, repair the cause of the flat and replace the tire on the rim. The tire was mounted on a rim manufactured by Goodyear, or its subsidiary, and is described as a multi-piece rim. It was designated by Goodyear as an M rim. One side of the rim is a flange which holds the tire on to the rim on that side. The tire is held to the rim on the other side by two rings called the side ring and lock ring. These rings go around the rim but are removed in order to remove the tire from the rim. The side ring weighs 22.2 pounds and the lock ring weighs 7.2 pounds.

Wolf said that he laid the rim and tire on the floor and pried off the lock ring with a tire tool. There was a small opening for the tool to be inserted to pry off the lock ring. After the lock ring was removed Wolf simply lifted the side lock off without the aid of the tool. Wolf said he laid the rings out and looked at them to try to make sure that he would put them back the way they came off.

The tire was a tube type and when Wolf had removed the tire from the rim he discovered that the valve stem in the tube had been damaged and that caused the loss of air. Wolf repaired the valve stem and placed the tube in the tire and the tire on the rim. He then put the side ring on the rim and thereafter the lock ring. Wolf got the lock ring started and stood on the tire and walked around placing his weight on the lock ring to push it down. He heard the lock ring snap as if it were properly seated. He thereupon took a hammer and went around the lock ring tapping it to make sure it was secure. Wolf stated that when he looked at the lock ring it looked the same as when he took it off and appeared to fit snugly.

Wolf stated that he had no experience with this type of rim and was unaware of the danger involved in inflating the tire without taking precautions to protect against the tire forcing off the rings with explosive force when it was inflated. Nevertheless, Wolf was aware of a safety cage in the shop in which tires were placed while they were inflated. Wolf took the tire to the cage but found that the tire and rim was too large for the cage. Wolf thereupon attached an air hose to an air chuck which was attached to the valve stem so that the tire could be inflated while Wolf was some distance away.

Stan Thomas, the owner of the company, saw Wolf standing astraddle the tire and told him not to be in that position. Wolf complied with that instruction. Wolf connected the air hose to the air chuck which was on the valve stem but in doing so was required to reach over the tire.

As Wolf was preparing to move away from the tire the tire suddenly forced the rings off with explosive force. At the instant of the explosion Thomas was starting to tell Wolf to move away but Wolf did not have an opportunity to get out of the way.

Wolf estimated that he had been inflating the tire between 25 and 40 seconds when the rings were blown off. An expert testified that when the lock ring was installed backward, the tire would force off the rings at a pressure of between 10 and 20 p.s.i. The expert estimated that it would take from 21 to 32 seconds to inflate the tire sufficiently to force off the rings.

The rings struck Wolf in the face causing serious injuries. No question concerning the injuries is presented.

Wolf presented Dr. Hahn, a professor of mechanical engineering, as his expert. Hahn testified that Wolf had installed the lock ring backward but that there was nothing in the way the rim and the rings were designed and manufactured that would prevent the lock ring from being installed backward. Hahn testified that with the lock ring placed on the rim backward it looked the same as it would if it were correctly assembled. In fact he stated that the notch or hole for the insertion

of a tool to remove the lock ring was larger and looked more accessible when the ring was on backward than it did when it was correctly installed.

The lock ring had a tab protruding from the inside of the ring which was ⅛" wide. Hahn testified that the purpose of the tab was to indicate the correct direction for the ring to face but there was nothing on the tab to indicate its purpose. There was no marking stating "this side out" or any other warning or direction to indicate the correct installation of the lock ring.

Hahn further stated there was nothing to prevent the tire from being inflated if the lock ring was installed backward. In short, the lock ring could be installed backward and have every appearance of being properly installed with no direction or warning as to the correct installation of the ring.

Hahn testified that it is a well known engineering principle that if a component can be reversed it will be reversed. Hahn further testified that if the lock ring were installed backward, tire inflation would invariably force off the ring with explosive force.

Hahn had examined records made available by Goodyear and found 16 incidents prior to Wolf's accident involving the same type of multi-piece rim involved in this case and found that four involved the lock ring being installed backward.

Goodyear offered no evidence.

Wolf submitted his case on the theory of negligence in the dangerous design of the multi-piece rim and failure to warn. The specification was that the lock ring could be installed backward and Goodyear was negligent in designing the rim in that fashion and was negligent in failing to warn that the lock ring could be installed backward.

■ Goodyear first contends the court should have sustained its motion for a di-

rected verdict or for judgment notwithstanding the verdict because there was insufficient evidence to establish that the accident resulted from a reasonably anticipated use.[2] Goodyear primarily argues that Wolf was totally inexperienced in changing a tire with a multi-piece rim. This led Wolf to inflate the tire while he was close to it without taking any precaution against the rings being forced off by pressure in the tire. Goodyear says it could not foresee that someone totally inexperienced in working with the M rim would be changing a tire as Wolf did. In *Pierce v. Platte–Clay Elec. Coop., Inc.,* 769 S.W.2d 769, 776[10] (Mo. banc 1989), the court stated:

> This Court has suggested that foreseeability is established when a defendant is shown to have knowledge, actual or constructive, that there is some probability of injury sufficiently serious that an ordinary person would take precautions to avoid it.

*Id.* In this case there is no need to resort to constructive knowledge on the part of Goodyear concerning the danger of the M type rim. Evidence set out above demonstrates that Goodyear knew that the lock ring could be installed backwards and the evidence to be set out later more fully demonstrates beyond doubt that Goodyear knew from 1970 on that the M type rim was dangerous to tire changers. Thus, Goodyear knew that there was a probability of injury of sufficiently serious proportions that an ordinary person would take precautions to avoid such injury. Further, the court in *Pierce* stated:

> In determining foreseeability for the purpose of defining duty, it is immaterial that the *precise* manner in which the injury occurred was neither foreseen nor foreseeable.

*Id.* at 776[8, 9]. Thus, it was unnecessary for Wolf to prove the foreseeability of the precise manner of his injury, that is that one inexperienced in changing tires would be injured by the M type rim. When Good-

---

**2.** No question is raised about the verdict director containing the words "reasonably anticipated use" in a products liability case submitted on a theory of negligence. Therefore, this court will not consider the question, but would point out the holding in *Blevins v. Cushman Motors,* 551 S.W.2d 602, 607–08[4] (Mo. banc 1977) (in negligence cases the duty owed is based on reasonable anticipation that harm is a likely result of acts or omissions).

year put the M type rim in the stream of commerce it knew that many people would be working with that rim and knew the dangers inherent in the design of the rim. It is not unreasonable to infer that Goodyear knew that some persons changing a tire on an M rim would be inexperienced. The evidence set out hereafter shows that Goodyear knew that the M type rim posed a danger to tire changers. Significantly the internal memos of Goodyear did not draw a distinction between experienced and inexperienced tire changers. It simply notes the danger to tire changers.

Goodyear knew that people would be changing tires on the M type rim and knew that the M type rim posed a danger in that situation. Wolf met his burden to prove that Goodyear reasonably anticipated that people would be changing tires on the M type rim and that such rim posed a danger to those persons.

■ Goodyear next contends that the court erred in denying its motion for directed verdict and judgment n.o.v. on the punitive damages claim because there was insufficient evidence to support the submission of punitive damages. Wolf submitted his case on negligent design and negligent failure to warn. To recover punitive damages in a negligent design or negligent failure to warn product liability case, the plaintiff is required to prove that the "defendant knew or had reason to know that there was a high degree of probability that the action would result in injury." *Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc.*, 700 S.W.2d 426, 436[17, 18] (Mo. banc 1985).

Goodyear states that the evidence failed to establish that there was a high probability that if the lock ring could be installed backward an injury would occur and that Goodyear knew of such high probability. The evidence from Dr. Hahn was that if a component can be reversed it will be reversed. In this case that meant that if the lock ring could be installed backward that it would be installed backward. The evidence as set out above was that there was nothing to indicate whether the lock ring was installed correctly or backward. The

evidence was that it looked the same in both the correct and wrong position and even installed backward the ring would snap so that it appeared to be seated and fitted snugly.

In addition, several company memos were introduced in evidence which revealed the knowledge that Goodyear had from at least 1970 about the dangerous propensity of the multi-piece rim. An office memo of July 13, 1970, stated that it was concluded that the continuation of the present program to better advise the field of potential safety problems resulting from improper tire rim servicing is most important.

An outline of a presentation made by Goodyear to Ford Motor Company in October, 1971, stated that the one-piece 15 degree drop center tubeless type rim was safer than the multi-piece rim because the one-piece had no loose parts and would eliminate cases where tire changers are hurt due to rings separating from rim bases. A similar statement was made in a presentation to General Motors in June, 1971. In an office memo dated November 30, 1972, it was stated:

The contradiction of (1) market trend to tubeless truck tires and rims/wheels and (2) Goodyear Tire interests was reviewed. Mr. Pilliod (Chairman of the Board of Goodyear) commanded an all-out effort to eliminate the safety hazards of multi-piece tube type truck rims so as to protect the Goodyear investment in tube type tire facilities. Requirements are:

1) No possibility of inflating assembly unless all loose rim component parts are fully engaged.

2) No possibility of disengaging loose rim components without complete deflation of tire. One Development Engineer at Metal Products has been assigned full-time to this development. Mr. Derleth emphasized the urgency of this project.

In a December 11, 1972, memo an assignment for rim design and engineering was made as follows:

A. Develop a multiple piece 5 degree flat base truck rim that will do the following.

1. Not allow inflation until the side ring or flange and lock ring are in proper position in rim base gutter.

2. Not allow removal of side ring or flange and lock ring until an assembly is deflated.

3. Retain loose components during run-flat and also retain tire on rim.

In an October 10, 1976, memo it was stated in relation to rims that a "safety program is necessary from the standpoint of explanation to customers." The memo continued that there was objection to including safety information in printed material designed to help sell rims.

The office memos quoted above, together with the other evidence, leave no doubt that Goodyear was well aware of the safety hazard of the multi-piece rim and the high probability that injury would result from its design and failure to warn. Despite this knowledge Goodyear was making the same rim in 1984 and 1986, which injured Wolf, as it was in the early 1970s. While the test for punitive damages in a product liability case is a strict one, *Bhagvandoss v. Beiersdorf, Inc.*, 723 S.W.2d 392, 397[5] (Mo. banc 1987), Wolf met his burden in this case.

■ Goodyear further contends that the imposition of punitive damages in this case violated its constitutional right of due process and equal protection of the law. For its equal protection claim, Goodyear contends that the admission in evidence of its net worth allows the jury to impose unequal punishment on parties because of their differing wealth. Although this constitutional claim was pleaded in its answer, when the net worth of Goodyear was introduced in evidence, Goodyear made no objection based on an equal protection basis. In *Callier v. Director of Revenue*, 780 S.W.2d 639, 641 (Mo. banc 1989), the court held that the constitutional question must be preserved throughout the proceedings. Here, Goodyear failed to preserve its equal protection argument when it allowed evidence of its net worth to go to the jury without any objection on the ground of the denial of a constitutional right.

■ Goodyear contends that the imposition of punitive damages violates its constitutional due process rights. The basis of the contention is that the jury is not given any standard by which to decide whether punitive damages should be awarded nor is there any guide as to the amount and the jury therefore has a limitless right to award damages in any amount it chooses. The U.S. Supreme Court has addressed the question of the constitutionality of punitive damages in light of a challenge that the imposition of such damages violates due process. In *Pacific Mutual Life Ins. Co. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the Court noted that historically the award of punitive damages in common law actions has been approved, but held that such approval did not insulate the practice from judicial scrutiny. The Court stated that its concern was about punitive damages that "run wild." The Court stated:

One must concede that unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities. *See Waters–Pierce Oil Co. v. Texas* (No. 1), 212 U.S. 86, 111 [29 S.Ct. 220, 227, 53 L.Ed. 417] (1909). We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus. (footnote omitted)

With that statement, the Court examined the procedure for awarding and reviewing punitive damages in Alabama.

The Court first reviewed the instructions to the jury by which the trial court told the jury that the purpose of punitive damages was not to compensate the plaintiff for any injury but to punish the defendant and to protect the public by deterring the defendant and others from doing such wrong in the future. The Court stated that the instructions gave the jury significant discretion in the determination of the amount of

punitive damages but such discretion was not unlimited. The Court stated the jury's discretion "was confined to deterrence and retribution, the state policy concerns sought to be advanced." The Court further noted that if punitive damages were to be awarded the jury " 'must take into consideration the character and the degree of the wrong as shown by the evidence and necessity of preventing similar wrong.' " The Court stated "[t]he instructions thus enlightened the jury as to the punitive damages' nature and purpose, identified the damages as punishment for civil wrongdoing of the kind involved, and explained that their imposition was not compulsory."

The instructions in this case address the same matters which the instruction in Haslip addressed. Here, the jury was instructed that if it found that the conduct of Goodyear showed complete indifference to, or conscious disregard for, the safety of others, then in addition to any damages to which the plaintiff was entitled under the actual damage instruction the jury "may award plaintiff Charles Wolf an additional amount as punitive damages in such sum as you believe will serve to punish defendant Goodyear and to deter defendant Goodyear and others from like conduct...." The instruction in this case is for all intents and purposes the same as the instruction in Haslip. The jury was told that punitive damages were not to compensate plaintiff when it was told that punitive damages would be in addition to the amount of actual damages. The same state policy concerns of deterrence and retribution are found in this case as in Haslip and as in Haslip, the jury was told to consider the evidence and to determine the amount necessary to be imposed to prevent similar wrongs.

The Court in Haslip also observed that Alabama had established post trial procedures for scrutinizing punitive damage awards by providing for review by the trial court and by appellate courts. The Court stated that "appellate review makes certain that the punitive damages[s] are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition."

In this state the review by both the trial court and the appellate court in an award of punitive damages is to determine the proper relationship between the degree of malice proved and the punitive damage award. Boyer v. Grandview Manor Care Center, 759 S.W.2d 230, 234–35[5, 6] (Mo. App.1988). In Holcroft v. Missouri K.T.R. Co., 607 S.W.2d 158, 163[11] (Mo.App.1980), this court stated:

> The award of punitive damages is peculiarly a function of the jury and absent an abuse of discretion an appellate court is not justified in interfering with the assessment.

The court further stated that the abuse of discretion referred to "has been defined as meaning 'so out of all proper proportion to the factors involved as to reveal improper motives or a clear absence of the honest exercise of judgment.' " Id. at 164[12] (quoting from Beggs v. Universal C.I.T. Credit Corporation, 409 S.W.2d 719 (Mo. banc 1966)).

In this case, the trial court had the opportunity to review the amount of the punitive damage award under the standard announced in Holcroft and upheld the award. This court has reviewed the punitive damage award under the same standard and finds that there was no abuse of discretion on the part of the jury.[3] The evidence was

3. Section 510.263, RSMo 1987, Cum.Supp., allowing for the trial court to enter a remittitur of punitive damages does not apply to this case because that section became effective after the injury herein. The power of the trial court to order remittitur was abolished by Firestone v. Crown Center Redevelopment Corp., 693 S.W.2d 99, 110[14] (Mo. banc 1985). However, the court in Firestone pointed out that Rule 78.02 gave the trial court the authority to grant one new trial on the ground the verdict is against the weight of the evidence. In Burnett v. Grif-

fith, 769 S.W.2d 780, 790[15, 16] (Mo. banc 1989), the court held that the trial court may, in its discretion, permit a new trial limited to the issue of damages and held that this rule permitted a new trial to be granted on the issue of punitive damages. Although it has not been argued that the trial court could not enter an order of remittitur in this case, the trial court could have granted a new trial on the issue of punitive damages if it had felt the amount of punitive damages was excessive. Likewise, this

strong that Goodyear was more concerned about the continued sale of the M type rim than it was with the danger to tire changers which the design of the rim posed. It can not be said that the jury abused its discretion in fixing the amount of punitive damages.

█ While the review procedure in this state is not as detailed as that of Alabama which the court examined in *Haslip*, nevertheless the amount of punitive damages in this case has been scrutinized by the trial court and by this court under the rule in *Holcroft*. Thus, Goodyear has had the benefit of appellate scrutiny of the award. Under the analyses utilized in *Haslip* this court finds that the award of punitive damages in this case did not offend the due process rights of Goodyear.

█ Goodyear also contends that before punitive damages can be assessed there must be a finding in favor of plaintiff, but because Wolf was found to be 45% at fault, it cannot be said that the jury finding was in his favor. Even though Wolf was found 45% at fault, the judgment is in his favor in the amount of $49,500 which is the amount of the judgment less the fault assessed against him. Thus, Wolf received a judgment for actual damages which meets the requirement for the award of punitive damages.

█ Goodyear finally contends the punitive damage award should be reduced by the 45% of fault assessed against Wolf. That contention was rejected in *Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71, 75 (Mo. banc 1990).

The judgment is affirmed.

All concur.

court could order a new trial under Rule 84.14 if it found the jury had abused its discretion in the award of punitive damages. Thus, Goodyear has had a meaningful post trial review of the amount of punitive damages to insure that such damages did not "run wild."