**Valerie COLLINS, Appellant/Cross–Respondent,**

v.

**William HERTENSTEIN, Brian Keeney, and Troy Thomas, Respondents/Cross–Appellants.**

**Nos. WD 59562, WD 59563, WD 59575.**

Missouri Court of Appeals, Western District.

Sept. 3, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 31, 2002.

Application for Transfer Denied Dec. 24, 2002.

David R. Smith, Kansas City, for Appellant.

Dale Close, Kansas City, for Respondent.

PAUL M. SPINDEN, Presiding Judge.

In this wrongful death action, Valerie Collins sued three Kansas City police officers who shot and killed her 13–year–old son, Timothy Wilson, Jr. A jury awarded $500,000 to her in actual damages against officers William Hertenstein, Brian Keeney and Troy Thomas, $100,000 in damages for aggravating circumstances against Hertenstein, and $50,000 each in damages for aggravating circumstances against Keeney and Thomas. The circuit court, however, granted Thomas' motion for judgment notwithstanding the verdict, finding that Thomas did not cause or contribute to cause Wilson's death. Collins appeals, and the officers cross-appeal.

We affirm the circuit court's judgment in part. We reverse that part of the judgment granting Thomas' motion for judgment notwithstanding the verdict and that part awarding damages for aggravating circumstances. We remand for a new trial on the issue of damages for aggravating circumstances only.

The lawsuit grew out of an investigation of a traffic violation on November 9, 1998, by Hertenstein and another Kansas City police officer, Lorenzo Simmons. The officers were working off-duty as security guards when they saw a pickup, driven by Wilson, "fishtail" at high speed. With its tires squealing, the pickup nearly hit parked cars. Hertenstein and Simmons pursued the pickup in their marked police car.

Hertenstein and Simmons radioed the dispatcher that they were chasing the pickup, and two other police vehicles joined the chase. Officers Keeney and Perry Wilkerson were in one car, and officers Thomas and Lee Malek were in the other. At times during the chase, Wilson's pickup nearly hit the officers' cars. The chase ended seven minutes later at 18th Street and Brighton in Kansas City where Wilson drove his pickup into a vacant lot. The pickup's wheels bogged in mud.

Trying to free the truck, Wilson gunned the pickup's engine, but the truck's spinning tires remained bogged. Wilkerson walked to the pickup's passenger side, banged on the window, and tried to open the door. It was locked. Keeney walked to the same door and banged on the window. Wilkerson and Keeney yelled for Wilson to turn off the engine and to raise his hands. Thomas went to the driver's side of the truck, banged on the window with a flashlight, and yelled at Wilson. Malek stood behind the pickup. Simmons remained in his police car. Although Hertenstein testified that he was at the passenger window banging on the window and yelling at Wilson, Keeney testified that only he and Wilkerson were banging on the passenger window and that he did not remember seeing Hertenstein at the window.

Wilson ignored the officers' commands and continued trying to free the pickup from the mud. The pickup's tires gained traction at one point and lurched backward. The truck hit Simmons and Hertenstein's police car. Simmons saw the pickup coming and jumped out of the patrol car before the pickup hit it. The pickup's side view mirror struck Thomas' arm and knocked him to the ground. The pickup's door and passenger mirror hit Wilkerson's shoulder and knocked him back several feet. As the pickup moved back towards Simmons' patrol car, Hertenstein ran to the truck's passenger window. After hitting Simmons' patrol car, the pickup moved forward. Keeney dived from the pickup's path of travel to avoid getting hit by it.

Hertenstein fired his pistol at Wilson five times, and four of the bullets wounded Wilson. Hertenstein testified that he shot Wilson because he saw Wilson reach beneath a coat. He said that he feared that Wilson was reaching for a gun. Herten-stein, however, did not mention this apprehension of a gun when he talked immediately after the shooting to an investigating homicide detective. Hertenstein told the detective that he had shot Wilson because Wilson was driving the pickup toward him.

When Hertenstein fired, three other officers fired their guns. Thomas shot twice, and one of the bullets wounded Wilson. Keeney shot once, wounding Wilson. Malek fired at a rear tire. Twenty-six seconds elapsed between Wilson's driving the pickup into the vacant lot and the officers' shooting Wilson. Keeney testified that he shot Wilson because he could not locate his partner, Wilkerson, when the pickup moved forward and feared that he was underneath the pickup. Thomas said that he shot Wilson because the pickup was coming towards him. Thomas, however, was standing on the driver's side of the truck when he shot, and the pickup was moving to the right, veering away from Thomas.

Wilson died from multiple gunshot wounds. A dog in the truck with Wilson also died from multiple bullet wounds.

One of the bullets from Hertenstein's gun entered the middle of Wilson's chest, went through his sternum, heart, esophagus, aorta, and diaphragm, and fractured the front part of Wilson's spinal vertebra. This wound alone was sufficient to have caused Wilson's death. Another of Hertenstein's bullets passed through Wilson's right forearm, fracturing a bone and tore through muscle before landing on the pickup's seat. Another bullet from Hertenstein's gun passed through the front of Wilson's right thigh and embedded into a muscle, and another passed through Wilson's right thigh and lodged behind Wilson's right knee.

A bullet from Keeney's gun entered the left side of Wilson's chest, fractured a rib, went through the upper portion of his left

lung, fractured another rib, and lodged under the skin in his lower neck and upper back region. As the bullet went through the lung, it caused a leak, which allowed air to escape the lung and caused the lung to collapse. This wound alone also could have caused Wilson's death.

The bullet from Thomas' gun passed through Wilson's left arm. A forensic pathologist indicated that this wound alone would not have likely caused Wilson's death.

### Collins' Appeal

Collins asserts that the circuit court erred in granting judgment notwithstanding the jury's verdict for Thomas. She contends that she made a submissible case against Thomas under three distinct theories: (1) that his gunshot was a contributing cause of Wilson's death; (2) that he acted in concert with other officers as a contributor to cause Wilson's death; and (3) that his gunshot was a contributed cause of Wilson's conscious pain and suffering.

 In reviewing the circuit court's granting of Thomas' motion for judgment notwithstanding the verdict, we must determine whether or not Collins made a submissible case. *Jungerman v. City of Raytown*, 925 S.W.2d 202, 204 (Mo. banc 1996). We do this by reviewing the evidence in a light most favorable to the plaintiff. *Id.* "A presumption favoring the reversal of a grant of JNOV exists, unless the evidence and inferences favorable to the plaintiff leave no room for reasonable minds to differ as to the outcome." *Sloan v. Bankers Life and Casualty Company*, 1 S.W.3d 555, 564 (Mo.App.1999).

 "Missouri law recognizes that where persons whose independent negligent acts coalesce to cause a single indivisible injury, each person may be jointly and severally liable for all the harm caused." *Brickner v. Normandy Osteopathic Hospital, Inc.*, 687 S.W.2d 910, 912 (Mo.App. banc 1985) (citing *Barlow v. Thornhill*, 537 S.W.2d 412, 418 (Mo. banc 1976)). The term "joint tortfeasor" includes a "single, indivisible harm caused by independent, separate, but concurring torts of two or more persons." *Id.* at 912. "An indivisible injury results when two or more causes combine to produce a single injury incapable of division on any reasonable basis[.]" *McDowell v. Kawasaki Motors Corporation USA*, 799 S.W.2d 854, 861 (Mo.App. 1990).

 Thomas' conduct need not have been the sole cause of Wilson's death—only a contributing cause. *Coggins v. Laclede Gas Company*, 37 S.W.3d 335, 339 (Mo.App.2000). Collins was not required to establish by absolute certainty a causal connection between Thomas' actions and Wilson's injury. *Id.* "This connection can be proven by reasonable inferences from proven fact or by circumstantial evidence—direct proof is not required; the jury may infer causation from circumstances." *Id.*

 Collins made a submissible case that Thomas' gunshot was a contributing cause of Wilson's death. Viewed in the light most favorable to Collins, the evidence established that a bullet from Thomas' gun wounded Wilson in the left arm.[1] Dr. Sam Gulino, a forensic pathologist, testified that two bullet wounds—one from Hertenstein's gun and the other Keeney's—were individually fatal and together caused Wilson's death. When asked

---

1. The forensic pathologist testified that Thomas did not fire a shot that hit Wilson. Collins' ballistic expert, however, concluded that a bullet fired from Thomas' gun hit Wilson's left arm. We view the evidence in a light most favorable to the jury's verdict.

whether or not the combination of the other wounds would have caused or contributed to cause Wilson's death, Gulino said:

A. Most likely not. These were basically flesh wounds. Certainly if he were unable to seek medical attention for a long period of time, then I suppose he could bleed sufficiently from them or eventually get some kind of infection that could lead to his death. However, given the short time period between being shot and his death, [shots fired by Hertenstein and Keeney] were the gunshot wounds which caused his death.

Q. All of the gunshot wounds caused bleeding; is that correct?

A. Yes.

Q. And was it bleeding, in your opinion, which caused his death?

A. Well, the mechanism of death when you have someone with complex gunshot wounds through the chest is complicated. Bleeding is certainly a large portion of it. But, in addition, when you have air escaping from a lung into the space around the chest, it creates a problem in the chest called a tension pneumothorax, wherein it disrupts the normal flow of blood through the blood vessels in the chest. So that it's not just one mechanism of bleeding. But that certainly is a large part of it.

Q. Bleeding is a large cause of his death in your opinion?

A. It is a large part of the mechanism of his death, yes.

Q. Based upon reasonable degree of medical certainty?

A. Correct.

Q. And in your opinion, he would have bled from all of these gunshot wounds, is that correct?

A. That's correct.

. . . .

Q. So it's likely, in your opinion, is it not, Doctor, that from the time these bullets entered [Wilson's] body until his death, he, number one, bled to death and while he was doing it, he was starved for oxygen and gasping for air.

A. I would agree with that statement except that it would not be from the time he was shot until he died, but rather from the time he was shot until the blood flow to his brain had decreased sufficiently that he was no longer conscious.

Later, on cross-examination, the officers asked Gulino:

Q. ... [I]n your opinion, within a reasonable degree of medical certainty[, the gunshot wounds to the arm and leg] did not and likely would not have contributed or caused the death of Mr. Wilson; is that your opinion?

A. That's correct.

Q. ... [W]ithin a reasonable degree of medical certainty, would the wound that just went through the arm, the flesh part of the arm, have caused or would have contributed to the death of Timothy Wilson?

A. No, it would not.

The officers contend that Collins did not make a submissible case against Thomas because she did not establish that Wilson's death would not have occurred "but for" Thomas' acts. The officers rely primarily on *Graham v. Ozark Mountain Sightseeing, Inc.*, 181 F.3d 924 (8th Cir.1999), in making their argument.

In *Graham*, the federal court concluded that, in a wrongful death action, a plaintiff must prove that a defendant's negligence was a direct cause of the victim's death. The *Graham* court also ruled that, if a plaintiff relies on medical experts, those experts must testify that they believe, within a reasonable degree of medical cer-

tainty, that, but for the defendant's negligence, the victim's death would not have occurred. *Id.* at 926.

In this case, the circuit court instructed the jury that it could find Thomas liable if it determined that he intentionally shot Wilson, used more force than was reasonably necessary, and caused or contributed to cause the wrongful death of Wilson. Although the forensic pathologist opined that Thomas' gunshot did not contribute to Wilson's death, the expert testified, within a reasonable degree of medical certainty, that bleeding was "a large part of the mechanism of [Wilson's] death." The expert acknowledged, of course, that Wilson bled from all of the wounds. This gave the jury a sufficient basis for concluding that Thomas' gunshot contributed to cause Wilson's death.

■ The jury had a sound basis for concluding that the bleeding in Wilson's arm contributed to the restricted flow of blood and, therefore, hastened Wilson's death. "[A]n act which accelerates death ... causes death[.]" *In re Estate of Eliasen,* 105 Idaho 234, 668 P.2d 110, 120 (1983). This is true even if the act hastens death by merely a moment. Although Thomas' gunshot alone should not have caused Wilson's death, the jury could have found that Thomas' acts coalesced with those of Hertenstein and Keeney to hasten Wilson's death; hence, the jury reasonably concluded that the bullet Thomas fired contributed to cause a single, indivisible

injury for which Thomas could be held liable.[2]

In her second point, Collins contends that the circuit court erred in denying her motion for new trial on the issue of damages for aggravating circumstances. The circuit court erred, she asserts, by not allowing her to admit evidence of the officers' current employment and income, by giving a cautionary instruction to the jury that it could not consider the officers' employment and income, and by limiting the scope and time of her closing argument.

■ Collins asserts that evidence of the officers' employment and income was relevant to establishing the officers' financial condition for the purpose of damages for assessing aggravating circumstances.[3] "Damages awarded for aggravating circumstances in wrongful death cases are punitive in nature, and a punitive damages analysis applies in reviewing an award of aggravating circumstances damages[.]" *Henderson v. Fields,* 68 S.W.3d 455, 486 (Mo.App.2001). Indeed, "[i]n *Call v. Heard,* [925 S.W.2d 840, 847–49 (Mo. banc 1996),] the Supreme Court jettisoned the term 'aggravating circumstances damages' for 'punitive damages,' thereby solidifying its holding in *Bennett* [*v. Owens–Corning Fiberglas Corporation,* 896 S.W.2d 464, 466 (Mo. banc 1995)], that aggravating circumstances damages are the equivalent of punitive damages." *Barnett v. La Societe Anonyme Turbomeca France,* 963 S.W.2d 639, 659 n. 8 (Mo.App.1997), *cert. denied,*

2. Because we reach this conclusion, we need not address Collins' other contentions that she made a submissible case against Thomas by establishing that he acted in concert with other officers to contribute to cause Wilson's death and that he contributed to cause Wilson's conscious pain and suffering.

3. In the argument portion of her brief, Collins suggests that the circuit court erred in exclud-

ing evidence that the Board of Police Commissioners probably would pay any judgment against the officers. Collins did not, however, raise this in her point relied on. Errors raised for the first time in the argument portion of the brief and that are not raised in the point relied on need not be considered by this court. Berger v. Huser, 498 S.W.2d 536, 539 (Mo.1973).

525 U.S. 827, 119 S.Ct. 75, 142 L.Ed.2d 59 (1998).

Section 510.263, RSMo 2000, provides the procedure for a bifurcated trial when a plaintiff seeks punitive damages. The statute says:

1. All actions tried before a jury involving punitive damages shall be conducted in a bifurcated trial before the same jury if requested by any party.

2. In the first stage of a bifurcated trial, in which the issue of punitive damages is submissible, the jury shall determine liability for compensatory damages, the amount of compensatory damages, including nominal damages, and the liability of a defendant for punitive damages. Evidence of defendant's financial condition shall not be admissible in the first stage of such trial unless admissible for a proper purpose other than the amount of punitive damages.

3. If during the first stage of a bifurcated trial the jury determines that a defendant is liable for punitive damages, that jury shall determine, in a second stage of trial, the amount of punitive damages to be awarded against such defendant. Evidence of such defendant's net worth shall be admissible during the second stage of such trial.

 Section 520.263.3 does not say that evidence of a defendant's net worth is the only evidence admissible when considering punitive damages. *Barnett*, 963 S.W.2d at 655. Indeed, net worth need not even be shown to recover punitive damages. *Mullen v. Dayringer*, 705 S.W.2d 531, 536 (Mo.App.1985). Net worth is just one factor the jury may consider in assessing punitive damages. *Moore v. Missouri–Nebraska Express, Inc.*, 892 S.W.2d 696, 714 (Mo.App.1994).

 "When determining the amount of punitive damages to be awarded, the worth or financial condition of the tortfeasor is a relevant consideration." *Green v. Miller*, 851 S.W.2d 553, 555 (Mo.App.1993); *Bennett*, 896 S.W.2d at 468. Any evidence of a defendant's financial status—not just his net worth—is relevant and admissible. *Barnett*, 963 S.W.2d at 655. Evidence of the officers' employment and income was relevant and should have been admitted during the second stage of the trial, particularly in light of the officers' testimony concerning negative net worth. The circuit court's refusal of Collins' evidence of the officers' employment and income improperly limited the jury's consideration of the financial condition of the officers, and, therefore, prejudiced Collins. We, therefore, remand to the circuit court for a new trial on the issue of damages for aggravating circumstances.[4] *See Burnett v. Griffith*, 769 S.W.2d 780, 791 (Mo. banc 1989).

### The Officers' Appeal

 The officers first contend that the circuit court abused its discretion when it would not allow them to introduce evidence of the drugs and drug paraphernalia found on Wilson at the shooting scene. They contend that the evidence was relevant to why Wilson was evading the police and to the seriousness of Wilson's threat to the

---

4. Because we reach this conclusion, we necessarily conclude that the circuit court should not have given the cautionary instruction to the jury that its determination of the net worth of the officers did not include the officers' employment. On retrial, the circuit court shall not give that cautionary instruction. Moreover, because we have granted a new trial on the issue of punitive damages, we need not address Collins' contention that the circuit court erred in restricting her closing argument in time and in scope. We note, however, that the regulation of closing arguments rests largely within the sound discretion of the circuit court. *Hagedorn v. Adams*, 854 S.W.2d 470, 478 (Mo.App.1993).

officers. The officers, however, did not preserve the issue for our review.

They do not direct this court to where in the record they attempted to introduce the evidence of the drugs and drug paraphernalia.[5] They merely assert that "[e]ach and every time [they] attempted to introduce evidence of drugs and drug paraphernalia in the possession of Wilson, they were denied the opportunity to present that evidence." They do not provide citations to the record where the circuit court made its ruling, and, therefore, have not established that they preserved their challenge for appeal.

"'It is not the function of the appellate court to serve as advocate for any party to an appeal.'" *Shochet v. Allen*, 987 S.W.2d 516, 518 (Mo.App.1999) (quoting *Thummel v. King*, 570 S.W.2d 679, 686 (Mo. banc 1978)). "As such, we have no duty to search the transcript or record to discover the facts which substantiate a point on appeal."[6] *Wilson v. Carnahan*, 25 S.W.3d 664, 667 (Mo.App.2000). "'That is the duty of the parties, not the function of an appellate court.'" *Id.* (citations omitted).

Rule 84.04(i) specifically requires that "[a]ll statements of fact and argument shall have specific page references to the legal file or the transcript." "Where Appellant's argument lacks references to the transcript pages containing the [circuit] court's ruling, the point is not preserved for appellate review." *Henderson*, 68 S.W.3d at 479–80. Indeed, as Rule 84.13(a) instructs, "[A]llegations of error not briefed or not properly briefed shall not be considered in any civil appeal and allegations of error not presented to or expressly decided by the trial court shall not be considered in any civil appeal from a jury tried case." The only exception to this would be if the error rose to the level of plain error. Rule 84.13(c).

Rule 84.13(c) grants us authority to consider "[p]lain errors affecting substantial rights ... when [we find] that manifest injustice or miscarriage of justice has resulted" from the plain error. The rule presents a bit of a conundrum by granting us authority to review plain error only if we find manifest injustice or a miscarriage of justice. Making a finding of manifest injustice or a miscarriage of justice seems tantamount to a review. The Supreme Court suggested in *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc), *cert. denied*, 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995), that it intended for this seemingly enigmatic rule to mean that we should first examine plain error "facially," and review the matter only if we discern a substantial ground for believing that manifest injustice or miscarriage of justice has resulted from plain error. If we find that the claim of plain error does not facially establish substantial grounds for believing that manifest injustice or miscarriage of justice has occurred, we should decline to exercise our discretion to review a claim of error under Rule 84.13(c). "The rule makes it clear that not all prejudicial error—that is, reversible error—can be

---

**5.** In their reply brief, the officers provide this court with a citation to the transcript where they attempted to introduce evidence concerning the items found in Wilson's pockets, which included drug paraphernalia, cocaine, 30 individual packaged packets, and handcuffs. They attempted to introduce this evidence, however, in the second stage of the bifurcated trial for aggravating circumstances. We deal with the officers' contention that this evidence should have been admitted in this stage of the trial later in this opinion.

**6.** The transcript in this case covers 16 days of pretrial, trial and post-trial proceedings and spans 2026 pages of transcript.

deemed plain error." *State v. Dowell,* 25 S.W.3d 594, 606 (Mo.App.2000). Plain error is evident, obvious and clear error. *In re Moore,* 885 S.W.2d 722, 727 (Mo.App. 1994); *Ryder Farms, Inc. v. Hullinger Trucking, Inc.,* 837 S.W.2d 575, 576 (Mo. App.1992).

We do not discern plain error in the circuit court's not allowing the officers to introduce evidence of the drugs and drug paraphernalia. Admissibility of evidence is a matter for the circuit court's discretion, and we will not disturb the circuit court's ruling unless we discern that it has abused its discretion. *Nelson v. Waxman,* 9 S.W.3d 601, 603 (Mo. banc 2000). " 'The [circuit] court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the [circuit] court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration.' " *Oldaker v. Peters,* 817 S.W.2d 245, 250 (Mo. banc 1991) (citation omitted). "The focus is not on whether the evidence was admissible, but on whether the [circuit] court abused its discretion in excluding the evidence." *Still v. Ahnemann,* 984 S.W.2d 568, 572 (Mo.App.1999).

■ We do not discern from the record facially that the circuit court abused its discretion. The test for relevancy is whether the evidence offered tends to prove or disprove a fact in issue or corroborates other relevant evidence. *Kansas City v. Keene Corporation,* 855 S.W.2d 360, 367 (Mo. banc 1993). When the offi-

cers shot Wilson, they did not know whether or not he had narcotics; thus, given the facts of this case under plain error review, Wilson's possession of drugs and drug paraphernalia appears, on its face, to be irrelevant to the issue put to the jury: whether the officers acted reasonably or used more force than was reasonably necessary when they shot Wilson. *See Schoor v. Wilson,* 731 S.W.2d 308, 314 (Mo.App.1987) ("Whether a person has reasonable cause to apprehend that he is in danger is to be resolved upon the facts and circumstances as they appeared to the defendant at the time he committed his acts of self-defense."). We decline plain error review.

■ The officers next assert that, because the circuit court admitted into evidence a gun found in Wilson's truck, the circuit court should have also admitted the drugs and drug paraphernalia. They argue that "[t]he decision to admit one claimed 'prejudicial' item and not admit the other claimed 'prejudicial' item[] was an abuse of discretion." We disagree.

Because Hertenstein testified that he believed that Wilson was reaching for a gun, the circuit court did not abuse its discretion in allowing the introduction of the gun into evidence. The drugs, on the other hand, played no part in the determination of whether or not the officers used more force than was reasonably necessary when they shot Wilson.[7]

■ The officers next contend that the circuit court abused its discretion when it

7. The officers also rely on *Stevenson v. D.C. Metro. Police Dept.,* 248 F.3d 1187 (D.C.Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 459, 151 L.Ed.2d 377 (2001), to support their contention that the drugs and drug paraphernalia were admissible. *Stevenson* involved a § 1983 action against the police officers for violations of the defendant's rights under the Fourth, Fifth and Fourteenth amendments to the United States Constitution. It did not involve a wrongful death action. Hence, we do not find it persuasive. Moreover, in *Stevenson,* the circuit court admitted into evidence a gun found on the defendant that was involved in a police shooting. The focus for this issue is not whether the evidence was admissible, but whether the circuit court abused its discretion in excluding the evidence. *Still,* 984 S.W.2d at 572.

allowed Collins to make "references to a planted or throw down gun" in Wilson's truck. The officers, however, do not identify in the record the testimony, evidence, or argument that they objected to in regard to the planted gun or identify any rulings of the circuit court on any objections concerning the planted gun. In their reply brief, the officers acknowledge that the only objection found in the record concerning evidence of a planted gun was in *voir dire*. Thus, they attempt to change their point relied on in their reply brief to assert that statements made by Collins' attorney in *voir dire* were prejudicial and that the circuit court should have granted a mistrial.

■■■■■■ A party's failure to object at trial to testimony, evidence or argument preserves nothing for review on appeal. *Brandt v. Pelican*, 856 S.W.2d 658, 664 (Mo. banc 1993); *Letz v. Turbomeca Engine Corporation*, 975 S.W.2d 155, 171 (Mo.App.1997). Moreover, assertions of error made for the first time in a reply brief do not present issues for appellate review. *Pearman v. Department of Social Services*, 48 S.W.3d 54, 55 (Mo.App.2001).

■■■■ The officers next claim that the circuit court abused its discretion when it refused to allow them to present evidence of Wilson's character and state of mind. They contend that Collins "opened the door" for character evidence by characterizing Wilson's actions as those of a scared teenager who sneaked out of his house, drove a vehicle without being of legal age, committed traffic violations and attempted to flee from the police. The officers argue

that Collins repeatedly referred to Wilson as "the kid," the "child," "the twelve year old," and "the thirteen year old" and that such references reinforced the idea to the jury that Wilson was a young, scared individual who was out in a truck committing traffic violations when executed by the police. They assert that they should have been allowed to show the true character of Wilson, which would have included evidence that he possessed drugs and appeared to be an active drug dealer, that he had been arrested twice, that he had served time in a halfway house, and that he was not even living full-time at Collins' home.

■■■■ The officers appear to be contending that evidence of Wilson's character should have been allowed in the first phase of the bifurcated trial—the phase in which the jury determined the liability of the officers and the compensatory damages. In their argument, the officers point to comments by counsel during *voir dire*, opening argument and closing argument and to questions asked of police officers and Collins' expert witness to suggest that Collins opened the door to character evidence. They also provide citations to the transcript wherein they objected to some of Collins' comments concerning Wilson's character and state of mind. The officers, however, do not direct us to where in the record they attempted to introduce evidence that Wilson possessed drugs and appeared to be an active drug dealer, that he had been arrested twice, and that he had served time in a halfway house and where in the record the circuit court did not allow such evidence.[8] When they do

---

**8.** Again, in their reply brief, the officers provide this court with a citation to the transcript where they attempted to introduce evidence concerning the items found in Wilson's pockets, which included drug paraphernalia, cocaine, 30 individual packaged packets, and handcuffs. They also attempted to offer evi-

dence that Wilson had a juvenile record and that he had spent time in a halfway house. The officers, however, attempted to introduce this evidence in the second stage of the bifurcated trial for aggravating circumstances. We deal with the officers' contention that this

point to certain instances in the argument portion of their brief, they do not cite where in the transcript or legal file we can find the alleged error. They do not cite where in the record the circuit court made its ruling; therefore, they have not established that they preserved their challenge for appeal. Nor do we discern plain error.[9]

In their statement of facts, the officers do provide references to the transcript pertaining to the testimony by the Jackson County medical examiner. The medical examiner testified that he found Wilson's body to be that of a "normal healthy young male child." On cross-examination, the officers claimed that Collins had "opened the door" for the medical examiner to testify about the results of Wilson's drug test. The officers wanted to ask the medical examiner, "In your medical opinion, does a normal healthy 13 year old male have [a breakdown product of marijuana, called carboxy tetrahydrocannabinol] in his system?" The circuit court did not allow the question. The circuit court found that Collins did not open the door to the evidence. The officers never asserted to the circuit court that the evidence was admissible as character evidence or to prove Wilson's state of mind. We will not convict the circuit court of error on an issue that it was not accorded an opportunity to rule. *Lincoln Credit Company v. Peach,* 636 S.W.2d 31, 36 (Mo. banc 1982), *appeal dismissed,* 459 U.S. 1094, 103 S.Ct. 711, 74 L.Ed.2d 942 (1983).

■ The officers next assert that the circuit court abused its discretion by refusing to admit evidence, which, they contend, pertained to the amount of damages suf-

fered by Collins. Although the officers put their contentions in a single point relied on, we address each separately because some of the evidence pertained to compensatory damages and other evidence pertained to aggravating circumstances damages. "Multiple contentions not related to a single issue may not be grouped together in a single point relied on." *In the Interest of A.H.,* 963 S.W.2d 374, 379 (Mo. App.1998), *overruled on other grounds, State ex rel. Stubblefield v. Bader,* 66 S.W.3d 741 (Mo. banc 2002).

■ Moreover, the officers have not preserved these contentions for appeal. In their argument, they do not provide citations to the record where they attempted to introduce the specific evidence or where the circuit court made its ruling disallowing the evidence. For some of the contentions, they also provide no citation of authority as to why the evidence would be admissible, and they fail to provide the evidence as part of the record on appeal. Thus, we address the contentions for plain error only.[10]

■ First, they claim that the circuit court should have allowed them to introduce into evidence a mug shot photograph of Wilson because the circuit court allowed Collins to show the jury two photographs of Wilson, "one of which showed Wilson in a particularly angelic looking pose." We do not discern plain error in the circuit court's not admitting the photograph into evidence. Whether or not the photographs that Collins submitted depicted Wilson as "angelic" is not a sufficient legal reason to require admission of a mug shot photograph of Wilson.

---

evidence should have been admitted in this stage of the trial later in this opinion.

9. *See supra* pp. 98–99 for discussion of Rule 84.04 and plain error review.

10. *See supra* pp. 98–99 for discussion of Rule 84.04 and plain error review.

■ Second, the officers contend that the circuit court erred in not allowing them to present evidence of what was contained on all the property inventory sheets, which included all the items found in Wilson's pockets. They assert that Collins opened the door to this evidence when a crime scene technician mentioned the inventory sheets in her testimony. We do not understand how a crime scene technician's testimony that she had signed the inventory sheet used to recover the gun and that someone else approved the inventory sheets containing the other evidence "opened the door" to the officers' introducing other evidence found on the inventory sheets. We do not discern plain error.

■ Next, the officers complain that the circuit court erred in not allowing them to impeach Phyllis Rose with the testimony of two witnesses who had interviewed Rose previously and to whom she had made statements inconsistent with her testimony. The alleged error does not rise to the level of plain error.

■ We do not understand facially from the record how the evidence was relevant to the issues of the case. Rose testified that, when she told Collins that the police had killed her son, Collins replied, "If the police shot my son, they are going to pay." The officers wanted to impeach Rose with the testimony from two witnesses who would have testified that Rose told them that Collins said, "I'm in the money now," and "now I'll get paid." Although the officers contend that they were attempting to impeach Rose's testimony, they assert that the evidence was admissible, not for impeachment purposes, but for the purpose of establishing the relationship between Collins and Wilson and the amount of damages suffered by Wilson's death. "Immaterial and incompetent evidence may not be got before the jury under the guise that it impeaches or discredits the witness." *Hungate v. Hudson*, 353 Mo. 944, 185 S.W.2d 646, 649 (1945). The circuit court instructed the jury to compensate Collins "for any damages you believe [Timothy Wilson's survivors] and Timothy Wilson sustained and that they are reasonably certain to sustain in the future as a direct result of the fatal injury to Timothy Wilson." The circuit court also instructed the jury to not consider "grief or bereavement suffered by reason of the death." Whether or not Collins believed that she was "in the money" is not material to the issue of damages in a wrongful death action. Hence, the circuit court did not abuse its discretion in refusing the evidence.

■ Next, the officers contend that the circuit court abused its discretion in prohibiting them from introducing into evidence the items found in Wilson's pockets because Collins introduced into evidence a diagram of the crime scene which contained notations: "Jacket—Item # 15 Containing Items 23–30" and "Items 16–22, 31 in victim's pant pockets." [11] They contend that the jury was entitled to an explanation about the notations made on the face

---

11. Collins correctly notes in her brief that the officers did not include the exhibit of the crime scene diagram as part of the record. The officers, however, filed the exhibit with this court on March 11, 2002. Rule 81.12(e) says, "If anything material is omitted from the record on appeal, the parties by stipulation, or the appellate court, on a proper suggestion or of its own initiative, shall direct that the omission or misstatement be corrected. The appellate court may, if it deems necessary, order that a supplemental record on appeal be prepared and filed by either party or by the clerk of the trial court including any additional part of the trial record, proceedings, and evidence, or the clerk may be directed to send up any original documents or exhibits." We accept the officers' filing of the exhibit as a supplemental record.

of the diagram. From the face of the diagram itself, we see no reason why the jury would be entitled to an explanation of the notations. We do not discern plain error and, therefore, do not review the issue.

 Finally, in regard to this point, the officers assert that the circuit court erred in not allowing them to present character evidence of Wilson, Collins, and Wilson's father, Timothy Wilson, Sr., during the aggravating circumstances phase of the trial. They contend that rejection of the evidence was prejudicial because the evidence pertained to the amount of damages suffered by Collins. Again, in their argument, the officers fail to direct this court to where in the record they attempted to introduce the evidence. They also do not cite the record where the circuit court made its ruling disallowing the evidence.[12] Because, however, this issue may arise on retrial, we address the merits of this point.

 In the aggravating circumstances phase of the trial, the officers attempted to present character evidence of Wilson and Wilson's parents and made this offer of proof:[13]

[W]e would like to present evidence of the character of the injured party in this case.

We consider the injured party to be Timothy Wilson, Sr., because of the nature of the wrongful death case and he is a member of the class.

We consider an injured party to be Valerie Collins.

We also suggest to the court that an injured party is Timothy Wilson, Jr., whose parents have a right to recover on his behalf.

Therefore, all three being injured parties, we believe we have a right to present character evidence.

. . . .

The offer of proof that we would make is that if allowed to present this type of evidence, we would establish the character of Timothy Wilson, Sr., by establishing the fact that he has been convicted on more than one occasion and is now and has previously served time in jail, in addition to the evidence that was presented in the liability section of this trial.

As to Valerie Collins, in addition to the evidence that was presented in the liability section of this trial, that she has been arrested and is currently pending charges involving drugs and possession of drugs.

As to Timothy Wilson, Jr., we would offer to prove to the Court that at the time of his death [Wilson] had on his person, in his pockets, drug paraphernalia, cocaine, in 30 individually packaged packets, handcuffs, and other items that would be unusual for a 13–year–old boy to have, that he has a juvenile record, has spent time in a halfway house, all factors that his mother knew—or at least the juvenile record and the halfway house, his mother knew.

We would offer to prove all of those as a part of the determination of the character of the injured party in this phase of the trial.

The circuit court did not allow the evidence and limited the evidence in the aggravating circumstances phase of the trial to only the officers' net worth. As we previously have discussed, limiting the evidence to net worth only was error. The

---

12. *See supra* pp. 98–99 for discussion of Rule 84.04 and plain error review.

13. Collins objected to the evidence but stipulated that the officers did not have to present "live evidence" for the offer of proof.

issue then becomes what evidence should be allowed in the aggravating circumstances phase of the trial.

In 1916, the Supreme Court faced the issue of whether or not an award of exemplary damages for malicious trespass was excessive, even after the remittitur by the circuit court. *Sperry v. Hurd*, 267 Mo. 628, 185 S.W. 170, 174 (1916). The court, relying in part on its previous opinion in *Buckley v. Knapp*, 48 Mo. 152, 162–63 (1871), held:

> A review of the many cases awarding exemplary damages discloses that a hard and fast rule for the measuring of such damages cannot be declared. Each case turns more or less upon its own peculiar facts. The character and standing of the parties, the malice with which the act was done, and the financial condition of the defendant are elements which should be taken into consideration in awarding damages of this character (Buckley v. Knapp et al., 48 Mo. 152; 8 R.C.L. §§ 151, 152, and cases therein cited; 2 Sutherland on Damages [3d Ed.] p. 1092), and the amount may be such as would by way of punishment and example serve to deter the occurrence of like acts in the future.

*Sperry*, 185 S.W. at 174. The *Buckley* case relied on by *Sperry* involved a libel action. In *Buckley*, the court announced in dicta:

> [F]or assault and battery ... the jury [is] not confined to the mere corporal injury which the plaintiff has sustained, but they are at liberty to consider the malice of the defendant, the insulting character of his conduct, the rank in life of the several parties, and all the circumstances of the outrage, and thereupon to award such exemplary damages as the circumstances may in their judgment require.

*Buckley*, 48 Mo. at 162–63 (relying on 2 Greenl. Ev., § 89). The *Sperry* court adopted this dicta in holding that the character and standing of the parties is an element that should be taken into consideration in awarding punitive damages.

The question is, however, who should take the character evidence into consideration—the jury or the court? The cases are split on this issue. In *Buckley*, the Supreme Court certainly says that the jury should consider the parties' "rank in life." *Id.* The *Sperry* court, saying that the parties' character is an "element[] which should be taken into consideration in awarding [punitive] damages," also suggests that the matter is for the jury's consideration. *Sperry*, 185 S.W. at 174. Indeed, this court, in *Lyons v. St. Joseph Belt Railway Company*, 232 Mo.App. 575, 84 S.W.2d 933, 946 (1935), *cert. quashed by State ex rel. St. Joseph Belt Railway Company v. Shain*, 341 Mo. 733, 108 S.W.2d 351 (1937), quoted the elements noted in *Sperry* and said that "the *jury* ... has considerable range in respect to the amount of the verdict in any particular case, according to the facts in the record thereof." [14] *See also Holcroft v. Missouri–Kansas–Texas Railroad Company*, 607 S.W.2d 158, 164 (Mo.App.1980); *Peak v. W.T. Grant Company*, 386 S.W.2d 685, 693 (Mo.App.1964); *Walker v. St. Joseph Belt Railway Company*, 102 S.W.2d 718, 726 (Mo.App.1937).

Recent cases, however, suggest that the parties' character is an issue only for the court when faced with a determination of whether or not the punitive damage award is excessive. Indeed, in *Moore v. Missouri–Nebraska Express, Inc.*, 892 S.W.2d 696, 714 (Mo.App.1994), this court set forth

14. We added the emphasis.

the factors that should be considered by the jury in making an award of punitive damages and the factors that should be considered by the court in granting a remittitur of punitive damages. The *Moore* court held that, in determining whether or not to impose punitive damages, the jury must consider malice, relationship to sustained injury and mitigating circumstances. *Id.* at 713. It also noted that the jury, in its discretion, may consider the defendant's net worth or financial condition. *Id.* at 713–14. But the *Moore* court then held that in reviewing the award to determine whether or not it is excessive, the circuit court may use the same factors as the jury and, in addition, may consider these factors in its post-verdict review:

1. the degree of malice of the act;

2. regarding the injured party:

 a) age, sex and health

 b) character

 c) injury suffered

 d) financial worth

3. regarding the defendant:

 a) intelligen[ce], standing or affluence

 b) financial worth

 c) character

4. all circumstances surrounding the conduct including mitigating and aggravating circumstances.

*Id.* at 714.[15]

The Supreme Court cited *Moore* with approval in *Call v. Heard,* 925 S.W.2d 840, 850 (Mo. banc 1996), *cert. denied,* 519 U.S. 1093, 117 S.Ct. 770, 136 L.Ed.2d 716 (1997). The *Call* court discussed the constitutional requirements for imposing punitive damages and then set forth additional factors to be considered in determining the award's propriety:

> To supplement the requirements set out above for imposition of punitive damages, the courts of this state have identified a variety of factors, a nonexclusive list, that may also be considered in determining the propriety of an award. Certainly a critical factor is the degree of malice or outrageousness of the defendant's conduct. *State ex rel. St. Joseph Belt Ry. Co. v. Shain,* 341 Mo. 733, 108 S.W.2d 351, 356 (1937).[16] In addition, aggravating and mitigating circumstances may be considered not only under the wrongful death statute, but in all other cases involving punitive damages. *Beggs[ v. Universal C.I.T. Credit Corporation],* 409 S.W.2d[719,] 724 [Mo. 1966)].[17] Furthermore, evidence of a defendant's financial status is admissible

**15.** The Moore court relies on *Maugh v. Chrysler Corp.,* 818 S.W.2d 658 (Mo.App.1991). The *Maugh* court lists all of these factors, but it says these are the "many factors a jury may consider in Missouri when assessing punitive damages." Id. at 662 n. 2.

**16.** In *State ex rel. St. Joseph Belt Railway Company,* the court held, "Exemplary damages are inflicted by way of punishment for the doing of an act maliciously and are proportioned to the degree of malice, criminality, or contumely characterizing the act, to the age, sex, health, and character of the injured party, the intelligence, standing, and affluence of the tort-feasor, and other like circumstances." 108 S.W.2d at 356. The court was

not clear as to who should consider these factors—the jury or the court. Although the court cited *Sperry,* which instructed that the factors should be considered by the jury, the issue in St. Joseph Belt Railway was whether or not the punitive damage award was excessive. It, therefore, seems that the court used the factors in reviewing the award for excessiveness.

**17.** In *Beggs,* the court said, "[T]he jury should take into consideration the attendant circumstances, ... including the mitigating or aggravating circumstances. The defendant's worth or financial condition ... is a consideration." 409 S.W.2d at 724.

as an indication of the amount of damages necessary to punish the defendant. *Id.* at 724. Among other relevant factors are: the age of the injured party, *State ex rel. St. Joseph Belt Ry. Co.*, 108 S.W.2d at 356; the character of the defendant, *Maugh v. Chrysler Corp.*, 818 S.W.2d 658, 662 (Mo.App.1991);[18] and the character of the injured party, *Holcroft v. MKT RR Co.*, 607 S.W.2d 158, 164 (Mo.App.1980).[19] See also, *Moore v. Missouri–Nebraska Exp., Inc.*, 892 S.W.2d 696, 714 (Mo.App.1994), for a compilation of factors.

*Id.* at 849–50. In *Call*, the wrongful death action was a court-tried case; therefore, the separation of factors between the jury and the court would not have been at issue. The court held, "Missouri's requirements for the imposition of punitive damages, in conjunction with the various factors that may be considered, satisfy the due process concerns[.]" *Id.* at 850. The court noted, however, that the defendant did not bring a claim that the punitive damage awards were excessive. *Id.*

This court's recent decisions also hold that the additional factors, including the injured party's character, is an issue for the courts—not juries—for reviewing whether or not punitive damage awards were excessive. *Barnett*, 963 S.W.2d at 666; *Letz*, 975 S.W.2d at 178. In *Barnett*, this court noted, "To supplement the requirements ... for the imposition of punitive damages, the courts of this state have identified a variety of factors, a nonexclusive list, that should be considered in determining whether the trial court abused its discretion in not further remitting the jury's punitive award." *Barnett*, 963 S.W.2d at 666. The *Barnett* court listed character of the injured party as one of those factors. *Id.* In *Letz*, the court noted that in reviewing a punitive damages award for excessiveness, the courts have considered the additional factors, including character of the injured party, in determining the propriety of the punitive damages award. *Letz*, 975 S.W.2d at 177–78.

We agree, therefore, with the circuit court's decision to disallow the evidence of Wilson's and his parents' character to be presented to the jury. The circuit court should be mindful, however, on the retrial of the punitive damages issue, that it may consider evidence concerning the character of the injured parties, along with other evidence, if punitive damages are awarded and the officers seek a review of the award by a motion for remittitur.

██ The officers next contend that the circuit court abused its discretion when it refused to allow separate trials for each of the officers. We disagree.

The decision of whether claims should be tried separately or jointly is within the circuit court's discretion of the circuit court, and we will not disturb its ruling unless we discern that it abused its discretion. *Guess v. Escobar*, 26 S.W.3d 235, 239 (Mo.App.2000). Rule 66.02 grants the circuit court the authority to grant separate trials "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy," but this authority is a matter of discretion. "The policy of the law[,]" however, "is to try all issues arising out of the

---

18. The *Maugh* court, as noted *supra* note 15, said the jury may consider the factors in assessing punitive damages. 818 S.W.2d at 662 n. 2.

19. In *Holcroft*, the court said, "[T]he jury could properly consider such elements as the degree of malice or positive wrongdoing exhibited by the defendant, the injury inflicted upon plaintiff, the financial worth of plaintiff and defendant, and the character of the parties." 607 S.W.2d at 164.

same occurrence or series of occurrences together." *Bhagvandoss v. Beiersdorf, Inc.,* 723 S.W.2d 392, 395 (Mo. banc 1987). Indeed, Rule 66.01(b) says:

> When civil actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the civil actions; it may order all the civil actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Collins' case against each officer involved common questions of law and fact. The officers assert, however, that they should have had separate trials because they all fired their weapons at Wilson for different reasons, so the jury should have had an opportunity to evaluate their reasons separately.

The circuit court gave separate instructions to the jury on the issue of liability for compensatory damages for each officer. The jury had to determine whether or not each officer intentionally shot Wilson, used more force than was reasonably necessary, and directly caused or contributed to cause Wilson's death.

The officers' giving different reasons for shooting Wilson does not show that the circuit court abused its discretion in not ordering separate trials. The evidence would not have been any different in separate trials. We do not see how the officers were prejudiced by the joint trial and how separate trials would have avoided prejudice or would have been conducive to expedition and economy. In fact, separate trials would not have been conducive to expedition and economy.

The officers also contend that the verdict against Thomas is proof that the jury did not treat the officers individually because, as the circuit court found by granting Thomas' motion for judgment notwithstanding the verdict, no evidence existed that Thomas caused or contributed to Wilson's death. Given our conclusion that the circuit court erred in granting the judgment notwithstanding the verdict against Thomas, we are not persuaded by the officers' contention.

■ The officers next contend that the circuit court abused its discretion when it refused to give the jury an instruction defining the term "reasonable force." [20] The court instructed the jury:

> On the claim of plaintiff Valerie Collins for compensatory damages for the wrongful death of Timothy Wilson against defendant [insert officer's name], your verdict must be for plaintiff Valerie Collins if you believe:
>
> First, defendant [insert officer's name] intentionally shot Timothy Wilson, and
>
> Second, defendant [insert officer's name] thereby used more force than was reasonably necessary, and
>
> Third, defendant [insert officer's name] thereby directly caused or directly contributed to cause the death of Timothy Wilson.

This instruction was based on MAI 23.02, MAI 19.01, and Illustration 35.19.

■ The decision to submit a definitional instruction is an issue involving the circuit court's discretion. *DeWitt v. American Family Mutual Insurance Company,*

---

20. At the instruction conference, the circuit court did express concern about the lack of a definition. The circuit court said, "I want the record to reflect that the Court is bothered by the fact that that term is not defined in the verdict directors; however, this court finds no provision in the MAIs, as they currently exist, for this court to give a definition as it is offered, but this court does share the concern about the lack of definition of that term."

667 S.W.2d 700, 711 (Mo. banc 1984). MAI 23.02's notes require that, if a battery arises out of a claim that a police officer used excessive force in his official duties, the court must instruct the jury to consider whether or not the officer used more force than was reasonably necessary. MAI 23.02 does not contain a definition of reasonably necessary or reasonable force. "When MAI does not require definition of the terms, definition is not required and may be an impermissible deviation." *Hoodenpyle v. Schneider Bailey, Inc.*, 748 S.W.2d 683, 687 (Mo.App.1988). We, therefore, do not discern that the circuit court abused its discretion in refusing to define reasonable force.

The Supreme Court has held that the MAI and its notes are not binding to the extent they conflict with the substantive law. *State v. Carson*, 941 S.W.2d 518, 520 (Mo. banc 1997). The officers, however, do not contend that the lack of definition conflicts with Missouri's substantive law.[21] Indeed, the officers recognize that the decision to submit the definition was within the circuit court's discretion. The officers' contention is without merit.

▇ The officers next aver four errors concerning the jury panel. Two of the alleged errors concern the circuit court's refusing to strike certain venire persons for cause. One of the alleged errors concerns the circuit court's granting Collins' motion to strike a certain venire person for cause. The last alleged error concerns the circuit court's failure to grant a mistrial after a juror admitted that she had watched television news coverage of the trial during the trial. Again, we note, "Multiple contentions not related to a single issue may not be grouped together in a single point relied." *In the Interest of A.H.*, 963 S.W.2d at 379. We do not condone the officers' violation of this standard.

Moreover, in their argument the officers again do not provide page references to the transcript where the alleged errors occurred or where the circuit court made the allegedly erroneous rulings. The officers, therefore, have not preserved these contentions, and we review for plain error only.[22]

▇ We do not discern plain error with any of the officers' contentions. They contend that the circuit court erred when it would not strike for cause venire persons who had previously had bad experiences with the police and a venire person who had formed an opinion that the actions of the officers were inappropriate. They also contend that the circuit court erred in striking a venire person for cause because she had worked for a police agency in a civilian capacity and because her roommate was attending the police academy. The circuit court, however, is vested with broad discretion in determining the prospective jurors' qualifications, and we will not disturb the circuit court's ruling on a challenge for cause unless we discern that it abused its discretion. *Henderson*, 68 S.W.3d at 475. "Because the [circuit] court is in a superior position to determine a venireperson's ability to impartially follow the law, any doubts as to its findings will be resolved in its favor." *Sheffler v. Arana*, 950 S.W.2d 259, 266 (Mo.App.1997).

▇ The officers also claim that the circuit court erred when it failed to grant their motion for mistrial after a juror indi-

---

**21.** The officers merely point to United States Supreme Court and Eight Circuit Court of Appeals decisions and note that those courts are "continually re-defining the meaning of reasonable force as it applies to police officers."

**22.** *See supra* pp. 98–99 for discussion of Rule 84.04 and plain error review.

cated that she had watched television news coverage of the trial. "A motion for new trial, based on a juror's acquisition of extraneous evidence, is left to the sound discretion of the [circuit] court." *Travis v. Stone,* 66 S.W.3d 1, 3 (Mo. banc 2002). Moreover, "it is generally not an abuse of discretion to deny a motion for new trial where the juror did not obtain any 'new, different or conflicting evidence'[.]" *Id.* at 5. The juror in this case told the circuit court that she did not see anything on the news report that was different from what she had seen in the courtroom and that nothing she saw would interfere with her ability to render a decision based solely upon the evidence and the instructions in the case. We do not discern plain error.

▮ The officers next assert that the circuit court erred in refusing to allow Maria Gallegos' testimony that Collins attempted to bribe her to procure false testimony from Gallegos' daughter. The officers claim that the evidence of the bribe tended to establish that Collins' case was weak and that the probative value of the testimony outweighed any prejudice. We disagree.

According to the officers' offer of proof,[23] Gallegos' daughter, Monique Gallegos, had previously told police that she had seen the shooting and that the officers involved in the shooting had taken Wilson out of his truck and killed him execution style outside of the truck. Monique Gallegos later recanted the statement.

In her sworn statement, Maria Gallegos testified that Collins came to her house and told her, "[I]f I let Monique testify and if [Collins] would receive an amount from the settlement that, you know, I wouldn't have nothing to worry about, she would buy us a house and a nicer car." This is the evidence of the bribe that the officers insist should have been admitted. Maria Gallegos, however, also testified that Collins came to her before her daughter recanted.

"[The circuit] court has considerable discretion in the exclusion of evidence and, absent abuse of discretion, its action will not be grounds for reversal." *Kelly v. Jackson,* 798 S.W.2d 699, 704 (Mo. banc 1990). Maria Gallegos' testimony merely establishes that Collins asked her to "let" her daughter testify. Collins did not request perjured testimony. Indeed, Gallegos' daughter had not recanted her statement when Collins' allegedly made the request, so at that point she did not know that Gallegos' daughter would be giving perjured testimony.

Moreover, the theory that Wilson was removed from the truck and shot outside the truck was not advanced at trial. Indeed, the only mention of this alternative theory came during the officers' cross-examination of Collins' expert. The officers asked the expert whether or not all of the evidence indicated that Wilson was shot

23. The offer of proof came in the form of a sworn statement by Gallegos that was marked and introduced at trial for the limited purpose of making an offer of proof. Collins correctly notes in her brief that the officers did not include this sworn statement as part of the record. The officers, however, filed the sworn statement with this court on March 11, 2002. Rule 81.12(e) says, "If anything material is omitted from the record on appeal, the parties by stipulation, or the appellate court, on a proper suggestion or of its own initiative, shall direct that the omission or misstatement be corrected. The appellate court may, if it deems necessary, order that a supplemental record on appeal be prepared and filed by either party or by the clerk of the trial court including any additional part of the trial record, proceedings, and evidence, or the clerk may be directed to send up any original documents or exhibits." We accept the officers' filing of the exhibit as a supplemental record on appeal.

inside the truck, and the expert said, "Yes. ... [I]t appeared that that's how it happened." He then offered, "I think the only question was—the original request by the attorneys was to try to make that determination. There was some comment that maybe he wasn't." We conclude the circuit court did not abuse its discretion in determining that the prejudicial effect of this evidence outweighed its probative value.

Finally, the officers contend that the circuit court erred in not granting a new trial "based on cumulative and prejudicial error that occurred in the selection of the jury, due to juror misconduct, due to prejudicial admission of evidence, due to prejudicial refusal to admit evidence, due to improper jury instruction and due to improper argument[.]" They assert that the cumulative effect of these errors requires a new trial even if the errors individually do not warrant a new trial. As we find no merit or prejudice in the officers' earlier points, this point must also fail. *See Szasz v. Tella,* 984 S.W.2d 129, 134 (Mo.App. 1998).

We, therefore, reverse the circuit court's judgment granting Thomas' motion for judgment notwithstanding the verdict. We also reverse the circuit court's judgment as to aggravating circumstances damages and remand for a new trial on the issue of aggravating circumstances damages only. As to the remaining contentions, we affirm the circuit court's judgment.

HAROLD L. LOWENSTEIN, Judge, and ROBERT G. ULRICH, Judge, concur.