**STATE of Missouri, Plaintiff–Respondent,**

v.

**Oscar Curtis GLOVER III, Defendant–Appellant.**

**No. 24797.**

Missouri Court of Appeals,
Southern District,
Division Two.

March 19, 2003.

Craig Johnston, Assistant State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Anne E. Edgington, Assistant Attorney General, Jefferson City, for respondent.

JOHN E. PARRISH, Judge.

Oscar Curtis Glover III (defendant) was convicted, following a jury trial, of two counts of possession of a controlled substance with intent to distribute.[1] § 195.211.[2] He was charged and convicted as a prior drug offender. § 195.275, RSMo 1994, and § 195.291. This court affirms.

Defendant shared a condominium in Branson, Missouri, with Nathaniel Meadows. Branson police conducted a surveillance of the property for two weeks after receiving reports of heavy traffic in and out of the condominium unit where defendant and Meadows resided. Branson Police Lt. Steve Daulton told of one occasion when he was observing the residence shortly after defendant had returned to it. Lt. Daulton observed eight vehicles come to and go from the premises in a one and one-half hour period. The people who entered the residence stayed "just a very

---

**1.** Count I charged possession of cocaine with intent to distribute. Count II charged possession of more than 35 grams of marijuana with intent to distribute.

**2.** References to statutes are to RSMo Cum. Supp.1998 unless stated otherwise.

short time" before leaving again. Lt. Daulton and other officers obtained a warrant to search the premises. Defendant and Meadows were at the premises when the search was conducted.

Meadows answered the door. Defendant was asleep on a couch in the living room. The search of the residence's master bedroom disclosed a number of defendant's possessions. His driver's license, credit cards, a fake identification card with defendant's picture, a shopping bag that contained a hospital bill in defendant's name, a family photo, and other personal documents with defendant's name were found. A shoebox with six bags of marijuana with total weight of 833.79 grams was found in the closet in the master bedroom. The shoebox had "owe lists" in it.[3] These were papers listing names, telephone numbers or pager numbers, with a listing of dollar amounts owed. Police also found $3,460 in the closet. A jacket in the closet had a small scale and three plastic bags that contained 79.26 grams of cocaine base. The jacket also had personal documents and a second "owe list" with names and amounts owed or paid for drugs.

A search of a smaller bedroom disclosed a small bag of marijuana on a tray behind a door and a bag that contained 21.46 grams of cocaine base in a camera case. Meadow's driver's license was in a nightstand in the smaller bedroom.

Defendant and Meadows were arrested following the search. While in custody, Meadows gave two statements. In the first, he stated that all the drugs found in the condominium belonged to him; that none belonged to defendant. Several days later Meadows recanted and provided a second statement in which he said the drugs that were in the smaller of the two bedrooms at the condominium were his; that the drugs found in the master bedroom belonged to defendant.

Meadows testified about giving different statements. He was asked on cross-examination by the prosecuting attorney if defendant made a request of him after he and defendant were arrested. Meadows answered, "Yes," and explained, "He asked me to take the charge because he had a daughter he was just getting in school; he couldn't take it, he would hang himself. He was crying. Just everything. He was asking me to take the rap for him." Meadows was then asked the following questions and gave the following answers:

Q. Mr. Meadows, then as you were back in that cell prior to seeing the judge but that you had been charged, both you and [defendant] were facing two felony possessions with intent, did he talk to you about a probation?

A. Yes.

Q. What did he—Did he tell you what—What did he tell you about that probation?

A. He needed to get out before he can get—before his probation officer finds out so he can abscond or—

Q. And did he indicate to you what he was on probation for? ·

A. I already knew what he was already on probation for.

Q. For what?

A. Marijuana—

The trial judge started to interject when defendant's attorney said, "Your, Honor, I'm going to -," followed by the judge

---

**3.** One of the officers who participated in the search, Robert Fryman, testified that "owe list[s]" were "list[s] people keep when they— it's what we call front somebody drugs. They don't make them pay for them right then and there. They give them a quantity of a drug and they go out and they're—they come back later with the money to pay them for it."

saying, "Jury disregard the last statement, please. Let's move along."

■ Defendant's first point on appeal contends it was error for the trial court to allow the state "to introduce evidence that [defendant] was on probation, even though [defendant] did not testify, and plainly erred for not *sua sponte* declaring a mistrial when the state elicited further evidence that [defendant] was on probation for an offense involving marijuana."

Nathaniel Meadows was called as a witness for defendant. He was asked on direct examination if he recalled making a confession after his arrest. He said he confessed "[e]ither two or three days later or after, somewhere in there." Meadows was asked if he said all the drugs in the apartment were his. He answered that he wrote a statement at one point saying they were. Defendant's attorney asked if he also stated in the statement "that none of those drugs belonged to [defendant]?" Mr. Meadows replied, "Correct. On the first one, yes." He was asked if he had been under the impression he would get probation. Mr. Meadows answered, "Yes." Defendant's attorney asked Meadows if he recalled making a later statement. Meadows answered that, probably two or three days later, he had. Defendant's attorney asked if the second statement was "a different sort of confession." Meadows said, "Yes. I told the truth." In response to further questioning by defendant's attorney, Meadows said that in the second statement, he said not all the drugs in the place were his.

Defendant, through Meadow's testimony, showed that inconsistent statements were made regarding defendant's ownership of the drugs he was charged with possessing. By showing Meadows had stated all the drugs were his, defendant's attorney undertook to challenge the state's contention that some drugs seized at de-fendant's residence belonged to defendant. In challenging the state's case, defendant's attorney elicited testimony from Meadows that he had received probation for possession of some of the drugs that were seized; that his probation was in return for Meadows' testimony at trial that defendant owned some of the drugs that had been seized. Defendant inferred that Meadows' testimony that drugs belonged to defendant was false; that the testimony was given as a means by which Meadows could avoid imprisonment.

During cross-examination of Mr. Meadows, the state sought to refute any inference that his second statement was untruthful. The state did this by questioning Meadows about the reason he first stated all the drugs were his and none belonged to defendant. Meadows testified that he first intended, at defendant's request, to shift the guilt from defendant to himself; that defendant wanted him to do that so defendant could escape the consequences the new offense would have on defendant's probation. Meadows said defendant told him he needed to get released so he could abscond before his probation officer learned of the arrest.

■ On cross-examination of Meadows, the state was entitled to explain or counteract the inference that Meadows lied about defendant's ownership of part of the drugs found in order to get probation. "[W]here a defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue defendant injects." *State v. Lingar,* 726 S.W.2d 728, 734–35 (Mo. banc), *cert. denied,* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987). *See also State v. Hamilton,* 892 S.W.2d 371, 379 (Mo.App.1995); *State v. James,* 805 S.W.2d 333, 335 (Mo.App.1991). The state did this by showing defendant's de-

sire to avoid repercussions because he was on probation for another offense. The trial court did not err in allowing that evidence.

Defendant further complains it was "plain error" for the trial court not to have *sua sponte* declared a mistrial when the state inquired and received an answer that the probation was for an offense involving marijuana. Defendant argues this was unduly prejudicial since the offenses for which he was being tried were drug offenses.

Defendant did not request the trial court to declare a mistrial. Any complaint that the trial court erred by failing to grant a mistrial was not preserved for this court's review. *State v. Guidorzi,* 895 S.W.2d 225, 231–32 (Mo.App.1995). Defendant tacitly acknowledges this by requesting review for plain error as permitted by Rule 84.13. Based on the record before it, this court does not find substantial grounds for believing that manifest injustice or miscarriage of justice occurred. This court declines defendant's request to grant plain error review.[4] Point I is denied.

Point II is directed to testimony by Mr. Meadows that he had purchased drugs from defendant. During cross-examination of Meadows, the state asked a series of questions concerning Meadows' acquisition of cocaine during the summer of 1999. Meadows testified that he was addicted to cocaine at that time. Initially, defendant objected to a question asking Meadows how he was supplying and paying for his addiction, stating that the question was directed to a prior bad act for which defendant was not charged. The trial court overruled the objection and Meadows answered, "selling drugs." A series of questions followed about activities in that regard. Meadows told of going to Kansas City to get drugs; that sometimes he and defendant would go together. Meadows was asked if, during that time, he actually bought cocaine from defendant. He answered that he did. Defendant's attorney interspersed, "[S]ame objection," to various aspects of those questions and answers.

Point II asserts that "[t]he trial court plainly erred in allowing the state to repeatedly introduce evidence that [defendant] sold drugs to Nathaniel Meadows, his co-defendant, because this allowed the state to introduce evidence of other uncharged crimes." Defendant argues the evidence "had little, if any, probative value to the two possession with the intent to distribute drug charges for which [defendant] was charged"; that "the prejudicial effect ... grossly outweighed any probative value, and [defendant's] alleged prior sales were introduced merely to show that [defendant] had a propensity to commit these type of crimes."

Defendant again asks this court to review a complaint for plain error. He has not raised claims of error directed to particular objections. If there were particular errors related to the issue about which defendant attempts to complain in Point II, he should have identified them and sought their review in the manner permitted by court rules. This court infers from defendant's failure to challenge particular evidentiary rulings of the trial court that he perceives no prejudicial error regarding particular questions asked and the answers given thereto. "No amount of non-error adds up to error." *State v. Gardner,*

---

4. *See Collins v. Hertenstein,* 90 S.W.3d 87, 98–99 (Mo.App.2002), regarding evaluation of claims of plain error.

8 S.W.3d 66, 74 (Mo. banc 1999). Point II presents nothing for this court's review. It is denied. The judgment is affirmed.

PREWITT, P.J., and SHRUM, J., concur.